LDL RESEARCH AND DEVELOPMENT II, LTD., A LIMITED PARTNERSHIP, ENSIGN MANAGEMENT GROUP, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
LDL Research & Dev. II v. Commissioner
Docket No. 18566-91
United States Tax Court
T.C. Memo 1995-172; 1995 Tax Ct. Memo LEXIS 166; 69 T.C.M. (CCH) 2411; April 13, 1995, Filed *166 Decision will be entered for respondent. For petitioner: David C. Wright and Travis L. Bowen. For respondent: David L. Miller. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent, for 1983, 1984, and 1985, mailed to Ensign Management Group, Inc. (petitioner), as tax matters partner, notices of final partnership administrative adjustment with respect to LDL Research and Development II, Ltd. (LDL). In such notices, respondent disallowed for each respective year deductions of $ 525,000, $ 194,245, and $ 391,965 claimed by LDL as research and development expenditures. The only issue for decision is whether these expenditures qualify as deductible research and development expenditures under section 174. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner's and LDL's principal places of business were in Salt Lake City, Utah. In 1981, Larson-Davis Laboratories, Inc. (the Lab), was organized by Brian Larson (Larson) and Larry J. Davis (Davis) as a Utah corporation for the *167 purposes of developing and marketing electronic testing equipment. When the Lab was first organized, Larson and Davis together owned 100 percent of the Lab's outstanding shares of stock. Both Larson and Davis had significant experience in developing and marketing electronic testing equipment. From 1976 to 1981, Larson and Davis were employed by Ivie Electronics, an electronics manufacturing company. Larson was a vice president, and he was responsible for the worldwide marketing of products developed by Ivie Electronics. Davis was a director of research and development at Ivie Electronics, and he was responsible for the successful development of more than 20 electronic products. Prior to their employment at Ivie Electronics, both Larson and Davis were employed as engineers for Hewlett-Packard Co. When the Lab was organized in 1981, Larson and Davis developed for the Lab a 5-year business plan. The 5-year business plan described generally the research to be performed, the products to be developed and manufactured, and the projected financial needs of the Lab for each of the subsequent 5 years. In 1982, Larson and Davis concluded that the Lab needed additional capital to continue *168 with its 5-year business plan and to develop, under its business plan, two particular electronic devices capable of monitoring transmissions from communications equipment and vibrations in equipment (hereinafter, the words "electronic devices" refer generally to this equipment and to the related technology to be developed). Larson and Davis, therefore, undertook a search for additional capital. After almost a year, Larson and Davis came in contact with Coordinated Financial Services Financial Corp. (CFS Financial), which agreed to attempt to provide the Lab with additional capital. In November of 1983, CFS Financial organized LDL as a Utah limited partnership to raise additional capital for the Lab. The general partners of LDL were Coordinated Financial Services Properties, Inc. (CFSProperties), and Steven F. Christensen (Christensen). CFSProperties was a Utah corporation organized as a wholly owned subsidiary of CFS Financial. Christensen was a director and assistant secretary of CFSProperties and of other subsidiaries of CFS Financial. CFS Financial drafted a private placement memorandum (PPM) regarding investments in LDL, and CFS Financial provided the PPM to interested *169 investors. The PPM explained that the stated purpose and business of LDL was to research and develop technology for the development of the two electronic devices. The PPM acknowledged, however, that the Lab, not LDL, would perform the research on and the development of the technology related to the electronic devices and that the Lab, not LDL, would manufacture and market any electronic devices developed with the technology. The PPM acknowledged that all of the essential activities surrounding the research, development, manufacture, and marketing of the electronic devices would be performed by the Lab. The PPM acknowledged that neither the general partners nor CFS Financial, which corporation was to be responsible for monitoring the Lab's progress, were experienced in the research, development, manufacture, and marketing of electronic devices similar to those that the Lab intended to develop. The PPM acknowledged that the Lab was to use its own sales force to market and sell the electronic devices. The PPM also acknowledged that the general partners of LDL had not performed a formal market study regarding marketability of the electronic devices. The first electronic device *170 to be developed by the Lab under the research and development agreement with LDL was referred to as a spectrum/wave analyzer and was to function as a portable device that would measure the quality and characteristics of transmissions from electronic communications systems, such as radios and satellites. The second electronic device to be developed by the Lab under the research and development agreement with LDL was referred to as a fast fourier transform analyzer and was to function as a mobile, battery-operated device that would monitor and measure movements in and vibrations of equipment and provide data useful in determining stress points and structural failures in equipment. The PPM represented generally that investors in LDL could expect to receive from their investments in LDL cash distributions and tax benefits. Cash distributions, not projected until at least 1986, were to be based on LDL's net income. According to the PPM, tax benefits would accrue to investors in LDL in the form of tax deductions relating to payments made by LDL to the Lab for research and development of the electronic devices. The PPM represented that payments to the Lab would qualify as expenditures *171 for research and development of the electronic devices, that the payments would be treated as currently deductible expenses under section 174, and that the expense deductions would be passed through to the investors in LDL. The PPM indicated that LDL expected to report tax deductible losses from 1983 through 1985 and that there was no assurance that LDL would ever earn a profit. The PPM did not provide any income projections. LDL offered two types of investments to investors: (1) Individual limited partnership units at $ 4,300 per unit; and (2) nonnegotiable promissory notes in the principal amount of $ 25,000 with an annual interest rate of 14 percent. From 1983 through 1986, 350 limited partnership units and a number of promissory notes were to be sold. The total capital to be raised was $ 1,905,000, as follows: 1983 1984 1985 1986Total
Limited Partnership
Units
$ 350,000
$ 560,000
$ 560,000
$ 35,000
$ 1,505,000
Promissory Notes
400,000
--  --  --  400,000
Total Capital
to be Raised
$ 750,000
$ 560,000
$ 560,000
$ 35,000
$ 1,905,000
The record does not indicate whether LDL actually raised all $ 1,905,000. According to the PPM, *172 of the $ 1,905,000 to be raised, about one-half, or $ 975,000, was to be expended for research and development of the electronic devices, and $ 25,000 was to be expended for license fees to be paid to the Lab. The remaining $ 905,000 was to be expended by LDL for legal and organizational costs, principal and interest payments on LDL's promissory notes, and salaries of the general partners. Only approximately $ 139,149, or 7 percent of the total $ 1,905,000 capital to be raised, was to be retained by LDL for cash reserves. If the income LDL earned was not sufficient to cover its principal and interest obligations under the promissory notes, each limited partner was obligated to contribute an additional $ 640 per unit to LDL. Under this provision, a total of only $ 224,000 in additional capital could be raised from the limited partners. In no other event were the limited partners of LDL obligated to contribute further capital to LDL beyond the $ 640 per partnership unit. On November 21, 1983, LDL entered into five separate supplemental agreements with the Lab regarding the research and development of the electronic devices: (1) A development license agreement; (2) a use-license *173 option agreement; (3) a development agreement; (4) a cross-license option agreement; and (5) a purchase option agreement. Under the terms of the development license agreement, LDL acquired from the Lab for a fee of $ 25,000 a nonexclusive license to use in the research and development of the electronic devices the existing base technology that the Lab had already developed and that related to the two electronic devices to be developed. According to the development license agreement, LDL was only permitted to use this base technology in connection with the research and development of the two electronic devices. Sometime in 1983, LDL paid to the Lab the $ 25,000 license fee. The development license agreement was to terminate on the earlier of October 1, 1986, or the date on which a product using the technology was available for sale to the public. Under the terms of the use-license option agreement, LDL acquired from the Lab an option to acquire a nonexclusive license to use the Lab's base technology in connection with subsequent sales of the electronic devices. This option was exercisable by LDL anytime after one of the electronic devices was available for sale to the public. *174 Once this option was exercised, the use license would last perpetually, and LDL would be required to pay the Lab a 0.25-percent royalty on gross proceeds from sales of all products containing the base technology. Royalty payments from LDL to the Lab under the use-license agreement would terminate when the royalty payments thereunder to the Lab totaled $ 80,000 . Under the terms of the development agreement, the Lab, not LDL, was to perform all research and development relating to the electronic devices, and LDL agreed to pay to the Lab a fee of $ 975,000 in consideration for such research and development activity. The Lab was required to maintain adequate books and records regarding all aspects of the research and development, and the Lab was required to send to LDL monthly and quarterly reports regarding the status of the research and development. The development agreement was to terminate on the earlier of October 1, 1986, or the date on which a product using the technology was ready to be sold to the public. The development agreement was to terminate concurrently with the development license agreement. Pursuant to the development agreement, LDL paid to the Lab $ 500,000 *175 in 1983, $ 350,000 in 1984, and $ 125,000 in 1985, for a total of $ 975,000. Whether LDL received monthly reports from the Lab is not established in the record. LDL did receive progress reports from the Lab but not always on a quarterly basis. Under the terms of the cross-license option agreement, if any technology was actually developed under the development agreement between the Lab and LDL, the Lab had the right or option to acquire a nonexclusive license to use the technology for approximately 1 year to manufacture and market the electronic devices. This option was exercisable by the Lab within 30 days after the earlier of October 1, 1986, or the date on which a product using the technology was available for sale to the public. If the Lab exercised this option, the Lab became obligated to pay to LDL a 12-percent royalty on gross proceeds from sales of the electronic devices. This nonexclusive license would last from the date of its exercise until the earlier of November 30, 1987, or a date 14 months after exercise of the option. Under the terms of the purchase option agreement, at termination of the above cross-license option agreement, the Lab would have the option to purchase *176 all of LDL's rights and interest in the two electronic devices and the resulting technology. The stated purchase price under this purchase option agreement for the Lab to purchase LDL's rights and interest in the electronic devices was as follows: (1) A royalty of 15 percent of annual gross proceeds from sales of the electronic devices, until the Lab had paid LDL $ 6,350,000; and (2) after payment of $ 6,350,000 to LDL, the Lab (or the individual owners of the Lab) would transfer to LDL ownership of 5 percent of the shares of each class of stock in the Lab. Additionally, if the Lab ever offered its shares of stock to the public, LDL would have an option to purchase at the offering price 30 percent of the publicly offered shares of stock in the Lab. In late 1985, the general partners of LDL began to experience financial difficulties, and they withdrew as general partners. On February 27, 1986, petitioner became the new general partner of LDL. On April 17, 1986, CFS Financial filed for protection under chapter 7 of the Federal bankruptcy laws. Sometime in 1985 or 1986, the Lab developed an electronic device called a Series 3100 Real Time Analyzer (the Analyzer), which combined *177 into one device the functions of the two electronic devices that were described in the PPM. In early 1986, the Lab entered into a contract with the U.S. Navy to sell to the Navy a number of the Analyzers. On April 16, 1986, LDL exercised its option under the use-license option agreement to use the Lab's base technology in the sale of the Analyzers. Other than through the Lab, however, LDL did not attempt to market the Analyzers on its own behalf or through agents or contractors. On October 1, 1986, the Lab exercised its cross-license option to manufacture and market the Analyzers. The Lab was initially successful in marketing and selling the Analyzers. By late 1988 or early 1989, however, as a result of technological advancements occurring in the industry (particularly the shift from analog to digital technology), the Analyzers became obsolete, and sales of the Analyzers declined. From 1986 through 1989, the Lab paid to LDL a total of $ 236,196 in royalties on sales of the Analyzers. The Lab did not exercise its option under the purchase option agreement to purchase either the technology relating to the Analyzer or the stated right of LDL to manufacture and market the Analyzer. *178 As indicated, under the nonexclusive license agreement, the Lab did not have the exclusive right to manufacture and market the electronic devices, and LDL, therefore, theoretically could have manufactured and marketed the electronic devices and the resulting technology developed by the Lab. LDL, however, other than through the Lab, has never manufactured or marketed any electronic devices. LDL did not have an alternate plan to manufacture and market the electronic devices if the Lab chose not to do so, and as of 1986, by the time the research and development of the electronic devices were completed, LDL did not have the financial ability to manufacture and market the electronic devices. From 1983 through 1987, LDL did not have any employees. LDL's activities with regard to the Lab and the development of the technology relating to the electronic devices were ministerial in nature and were limited to keeping the limited partners informed of the activities of the Lab regarding the electronic devices, receiving progress reports, and filing tax returns. The success of LDL was dependent on the research, development, and marketing efforts of the Lab. On its 1983, 1984, and 1985 partnership *179 information tax returns, LDL used the accrual method of accounting and claimed ordinary deductions for research and development expenditures of $ 525,000, $ 194,245, and $ 391,965, respectively, relating to the electronic devices. On audit, respondent determined that LDL was not engaged in a trade or business in connection with the research and development of the electronic devices as required by section 174, and respondent disallowed the claimed deductions. OPINION Section 174(a)(1) provides as a general rule that a "taxpayer may treat research or experimental expenditures which are paid or incurred * * * during the taxable year in connection with * * * [a] trade or business as expenses which are not chargeable to [a] capital account." Under this section, expenditures incurred for research and development in connection with a trade or business are deductible as ordinary expenses in the year in which they are incurred. Section 174(a)(1) applies not only to research and development expenditures incurred directly by a taxpayer, but also to research and development expenditures incurred by another at the request of and on behalf of the taxpayer. Sec. 1.174-2(a)(2), Income Tax Regs. *180 A taxpayer is entitled to an ordinary deduction for research and development expenditures even if, at the time the research and development expenditures were incurred, a taxpayer was not producing or selling a product and was not then engaged in a trade or business. Snow v. Commissioner,416 U.S. 500, 503-504 (1974). In order to be entitled to the deduction under section 174, however, there must have been, during the year at issue, a realistic prospect that the taxpayer would eventually be engaged in such a trade or business. Diamond v. Commissioner,92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991); see Levin v. Commissioner,87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987). Under section 174, in order to be entitled to deductions for research and development expenditures, the taxpayer must have been more than a mere passive investor. Green v. Commissioner,83 T.C. 667, 688 (1984); Harris v. Commissioner,T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992), *181 affd. 16 F.3d 75 (5th Cir. 1994). To distinguish between a taxpayer who was merely a passive investor and a taxpayer who was actively engaged in a trade or business, or a taxpayer who had a realistic prospect of eventually engaging in a trade or business in connection with the research and development expenditures, all of the surrounding facts and circumstances are relevant, including the following: (1) The intentions of the parties to the agreement; (2) the amount of capital retained by the taxpayer during the research and development period; (3) the exercise of control by the taxpayer over the person or organization doing the research; (4) the business activities of the taxpayer during the year in question; and (5) the experience of the taxpayer and of the others involved. Diamond v. Commissioner, supra; Levin v. Commissioner, supra; Double Bar Chain Co. v. Commissioner,T.C. Memo. 1991-572; Harris v. Commissioner, supra.These factors can be reduced to two principal factors: (1) The objective intent of the taxpayer to engage in a trade or business in connection *182 with the research and development expenditures; and (2) the capability of the taxpayer to engage in such a trade or business. Kantor v. Commissioner,998 F.2d 1514 (9th Cir. 1993), affg. in part and revg. in part on another issue T.C. Memo. 1990-380; Medical Mobility Ltd. Partnership I v. Commissioner,T.C. Memo. 1993-428. Petitioner alleges: (1) That LDL's role in directing and controlling the research, development, manufacture, and marketing of the electronic devices and of the related technology was regular and substantial; (2) that by granting to the Lab a nonexclusive license to manufacture and market the electronic devices, LDL retained some rights to manufacture and market the electronic devices; (3) that LDL had the right to receive reports from the Lab; and (4) that LDL had the right to require the Lab to spend $ 975,000 on research and development. Petitioner, therefore, argues that LDL was actively engaged in a trade or business. Petitioner also argues that, even if we conclude that during the years in issue LDL was not engaged in a trade or business, LDL had the capital, the experience, *183 and sufficient rights to eventually manufacture and market the electronic devices and, therefore, that there was a realistic prospect that LDL would eventually be engaged in a trade or business in connection with the electronic devices. Respondent argues that LDL did not exercise sufficient direction or control over the Lab for LDL itself to be regarded as being actively engaged in a trade or business in connection with the electronic devices. Respondent also argues that because LDL did not retain sufficient capital, because the general partners had no expertise or experience with regard to the manufacture and marketing of the electronic devices, and because the Lab, not LDL, was to perform all aspects of the research, development, manufacture, and marketing of the electronic devices, there was no realistic prospect that LDL would ever be engaged in a trade or business in connection with the electronic devices. The development and cross-license agreements make it clear that LDL was to exercise little direction or control over the Lab. The financial success of LDL was dependent upon the Lab's ability to improve upon the existing base technology that had been developed by the Lab. *184 The general partners of LDL had little or no experience in the research, development, manufacture, and marketing of electronic devices. The profitability of LDL was dependent upon the efforts of the Lab in developing and marketing the electronic devices, and, in that regard, LDL essentially placed total reliance upon the management and experience of Lab personnel. According to the agreements, the only significant control that LDL was permitted to exercise over the Lab was to require that the $ 975,000 paid to the Lab be used for research and development activities. The right of LDL to receive reports and the limitation on the Lab in the use of the $ 975,000 do not establish that LDL controlled or directed the Lab in the development and marketing of the electronic devices or that LDL was engaged in the trade or business of developing the electronic devices. Green v. Commissioner, supra at 690; Spellman v. Commissioner,T.C. Memo. 1986-403, affd. 845 F.2d 148 (7th Cir. 1988). The fact that LDL, under the various agreements, retained some limited legal rights to manufacture and market the electronic *185 devices does not establish that LDL was actively engaged, or had a realistic prospect of engaging, in a trade or business. There is no evidence that LDL availed itself of the legal right it possessed on paper. Levin v. Commissioner,832 F.2d 403 (7th Cir. 1987), affg. 87 T.C. 698 (1986). LDL did not itself attempt to manufacture and market the electronic devices, nor did LDL attempt to license the electronic devices to anyone other than the Lab. The only activities LDL engaged in were ministerial in nature and were limited to filing tax returns, receiving status reports from the Lab, and informing investors of the status of the research, development, manufacture, and marketing of the electronic devices. These are the types of activities that are typical of an investor merely managing investments. Green v. Commissioner, supra at 688-689; Harris v. Commissioner, supra.
Petitioner's witnesses testified that before LDL was formed, its general partners (CFS Properties and Christensen) prepared business plans, performed market research, and contacted experts in *186 the industry in order to determine how and for what markets the electronic devices were to be developed. These witnesses testified that the general partners of LDL used this information to instruct the Lab on how the Lab was to proceed with the research and development of the electronic devices. The testimony of petitioner's witnesses, however, was vague and contradicted the PPM in that the PPM acknowledged the inexperience of the partners of LDL and the reliance of LDL on the Lab to perform the research, development, manufacture, and marketing of the electronic devices. Petitioner did not produce any documentary evidence or other credible testimony that would indicate that the general partners of LDL exercised any significant direction or control over the Lab. In any event, the activities that the above witnesses described were not sufficient to establish that LDL was engaged, or had a realistic prospect of engaging, in a trade or business in connection with the electronic devices. These activities were typical of investors who review the economic viability of an investment before risking significant capital. Estate of Cook v. Commissioner,T.C. Memo. 1993-581. *187 After LDL paid $ 975,000 to the Lab under the development agreement, and after LDL paid various organizational costs and fees, LDL had only a minimal amount of capital that it could use to manufacture and market the electronic devices. The amount of capital retained by LDL would not have been sufficient for LDL to manufacture and market the electronic devices itself. Petitioner's witnesses testified that LDL could have raised additional capital through its general partners. No credible evidence, however, was presented to demonstrate that either the general or the limited partners of LDL had the ability to raise the additional capital LDL would have needed if LDL had attempted to manufacture and market the electronic devices itself. All of the essential activities surrounding the research, development, manufacture, and marketing of the electronic devices were to be performed by the Lab. LDL did not have any employees or equipment to undertake the manufacture or the marketing of the electronic devices, and LDL did not have in place an alternate plan to manufacture and market the electronic devices if the Lab did not exercise its rights under the cross-license option agreement *188 and under the purchase option agreement. LDL became involved with the development of the electronic devices only to the extent that it provided the Lab with capital. LDL existed only to finance the Lab's development of the electronic devices and to provide investment opportunities and tax benefits to LDL's partners. In all likelihood, after development of the electronic devices, and if the marketing of the devices by the Lab was successful, LDL would earn income only by receiving royalties on sales proceeds earned by the Lab.
LDL's limited retained right to manufacture and market the electronic devices does not indicate that there was a realistic prospect that LDL would ever be engaged in a trade or business in connection with the electronic devices. The existence of the nonexclusive license to manufacture and market the electronic devices indicates, at best, that there was only a mere possibility that LDL would ever be engaged in a trade or business in connection with the electronic devices. The mere possibility of engaging in a trade or business does not satisfy the requirements of section 174. Kantor v. Commissioner,998 F.2d at 1520; Spellman v. Commissioner, 845 F.2d at 150-151; *189 Levin v. Commissioner,832 F.2d at 406-407. We conclude that during the years at issue, LDL was not engaged in a trade or business in connection with the electronic devices and that there was no realistic prospect that LDL would ever be engaged in a trade or business in connection with the electronic devices. LDL and its general partners lacked the intent and the capability to engage in a trade or business in connection with the electronic devices. The facts of this case are similar to the facts of Scientific Measurement Sys. I, Ltd. v. Commissioner,T.C. Memo. 1991-69. In Scientific Measurement Sys. I, Ltd., a limited partnership entered into a research and development agreement with a research contractor. Most of the capital contributed to the partnership was either paid to the research contractor under the research and development agreement or was spent by the partnership on organizational costs. Only a minimal amount of capital was retained by the partnership for cash reserves. The general partners did not have any experience with the technology to be developed by the research contractor. The general partners *190 did not direct or control the research, development, manufacture, or marketing of the technology. After the technology was developed, the limited partnership was legally entitled to manufacture and market the technology. It did not, however, engage in either of these activities. Based on the above facts, we concluded in Scientific Measurement Sys. I, Ltd. that the partnership did not intend to engage in a trade or business in connection with the technology, that the partnership lacked the capability to do so, and that there was no realistic prospect that the partnership would ever be engaged in a trade or business in connection with the technology. The U.S. Court of Appeals for the Ninth Circuit recently decided Scoggins v. Commissioner,46 F.3d 950 (9th Cir. 1995), revg. T.C. Memo. 1991-263. The Ninth Circuit's conclusion that there was a realistic prospect that the partnership involved in that case would eventually be engaged in a trade or business was based on several facts that are distinguishable from the facts of the instant case. In Scoggins, the individual taxpayers organized and owned both a partnership *191 and a research corporation to perform research on and development of equipment that could apply layers of silicon on silicon wafers. The individual taxpayers had significant experience in developing and marketing similar equipment, and they directed the research on and development of the equipment. The individual taxpayers had the ability to provide the partnership with sufficient capital to manufacture and market the equipment if the corporation did not do so. To the contrary, in the instant case, the partners of LDL did not have any prior experience with equipment similar to the electronic devices, and the partners of LDL did not direct or control the research, the development, the manufacture, or the marketing of the electronic devices. LDL and the Lab were not related in any way. In summary, the facts before us indicate that LDL did not intend to, nor did it, direct or control the research, development, manufacture, or marketing of the electronic devices. The activities that LDL (and the partners thereof) engaged in were typical of investors managing their investments and were not of the type that amount to carrying on a trade or business. We conclude that because LDL was *192 not engaged in a trade or business in connection with the electronic devices and because LDL did not have a realistic prospect of ever engaging in such trade or business, LDL is not entitled, under section 174, to the claimed deductions for research and development expenditures. Decision will be entered for respondent.