T.C. Memo. 1996-206


UNITED STATES TAX COURT


STEPHEN H. GLASSLEY AND JUDITH GLASSLEY, ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13431-89, 19140-89          Filed April 30, 1996.
                24177-89.


<u>John E. Williams</u> and <u>Eric W. Bloom</u>, for petitioners.

<u>Rodney J. Bartlett</u> and <u>Brian M. Harrington</u>, for respondent.

_____

[1]    The following cases were consolidated herewith for purposes
of trial, briefing, and opinion:  Paul S. Mahoney, docket No.
19140-89; and Edward F. Houser, Jr. and Kathryn G. Houser, docket
No. 24177-89.  There are presently at least four other cases
docketed in this Court which by stipulation are bound by the
outcome of these consolidated cases.

CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION..........................2
OPINION OF THE SPECIAL TRIAL JUDGE.............................3
FINDINGS OF FACT..............................................4
   A.  Background................................................4
      1.  The Jojoba Industry in General.......................4
      2.  Carole A. Whittaker..................................5
      3.  Joseph E. Berberich.................................7
      4.  Jojoba Development Partners, Ltd.....................9
          a.  The Private Offering Memorandum..................9
          b.  The Research and Development Agreement.........15
          c.  The Option and Joint Venture Agreement.........20
          d.  The Farm Lease.................................23
          e.  The Option and Farm Lease Agreement............24
      5.  Petitioners........................................25
          a.  Petitioners Stephen H. Glassley and Judith S. Glassley....................................25
          b.  Petitioner Paul S. Mahoney.....................28
          c.  Petitioners Edward F. Houser, Jr. and Kathryn G. Houser.....................................29
   B.  The Jojoba Plantation......................................32
   C.  The Consequences of Petitioners' Initial Investment.....41
   D.  The Experts...............................................43
      1.  Paul H. Gross......................................43
      2.  Dr. Eberhardt......................................47
      3.  Marvin T. Parr.....................................48
OPINION......................................................51
   A.  The Criteria That Must Be Satisfied For Expense Treatment Under Section 174........................................51
      1.  The Expenditures Must Be For Research or Experimentation................................52
      2.  The Expenditures Must Be Paid or Incurred on Behalf of the Taxpayer..................................64
      3.  The Expenditures Must Be Paid or Incurred in Connection with the Taxpayer's Trade or Business....68
   B.  Negligence................................................77
      1.  Petitioners Glassley and Houser....................78
      2.  Dr. Mahoney........................................82
   C.  Increased Interest........................................82

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These cases were assigned to Special Trial

Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with
and adopts the opinion of the Special Trial Judge, which is set
forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, <u>Special Trial Judge</u>:  Respondent determined
deficiencies in and additions to petitioners' Federal income
taxes as follows:

| | | | Additions to Tax | | |
|---|---|---|---|---|---|
| Petitioners | Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(1) | Sec. 6659 |
| Glassley | 1981 | $20,222.00 | $1,011.00 | [1] | - |
| Mahoney | 1981 | 23,283.00 | 1,164.15 | [2] | $6,984.90 |
| Houser | 1981 | 19,476.06 | 1,337.12 | [3] | - |
| | 1982 | 160.00 | 277.35 | [4] | - |

[1]50 percent of the interest due on $20,222.
[2]50 percent of the interest due on $23,283.
[3]50 percent of the interest due on $19,476.06.
[4]50 percent of the interest due on $160.

In the statutory notices of deficiency for petitioners Stephen H.
Glassley and Judith S. Glassley (petitioners Glassley) and
petitioner Paul S. Mahoney (Dr. Mahoney), respondent also
determined that the provision for increased interest under
section 6621(c)[3] applied.  Subsequently, respondent asserted by
first amendment to answer that petitioners Edward F. Houser, Jr.,

---

[2]     All section references are to the Internal Revenue Code in
effect for the tax years in issue, except as otherwise indicated.
All Rule references are to the Tax Court Rules of Practice and
Procedure.

[3]     Sec. 6621(c) was repealed by sec. 7721(b) of the Omnibus
Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103
Stat. 2106, 2399, effective for tax returns due after Dec. 31,
1989, OBRA 89 sec. 7721(d), 103 Stat. 2400.  The repeal,
therefore, does not affect the instant cases.

and Kathryn G. Houser (petitioners Houser) were liable for increased interest under section 6621(c).[4]  Respondent concedes that there is no addition to tax due from Dr. Mahoney under section 6659.

The issues remaining for decision are:  (1) Whether petitioners are entitled to deduct losses relating to their investments in a limited partnership, Jojoba Development Partners, Ltd., which arose principally from that partnership's deduction of purported research and development expenditures paid or incurred during 1981; (2) whether petitioners are liable for additions to tax for negligence; and (3) whether petitioners' underpayments of tax are attributable to a tax-motivated transaction for purposes of computing increased interest pursuant to section 6621(c).

### FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

A.  Background

1.  The Jojoba Industry in General

The jojoba plant is a shrub that is native to the Sonoran Desert region in Arizona, California, and Mexico.  A jojoba plant

---

[4]    Respondent asserted also by first amendment to answer that Dr. Mahoney was liable for increased interest under sec. 6621(c). Respondent had determined in the statutory notice of deficiency as well that the provision for increased interest under sec. 6621(c) applied.

may live well over 100 years. The female jojoba plant produces a seed, sometimes referred to as a bean, that contains approximately 50 percent by weight of an unusual oil. Jojoba oil is actually a liquid wax ester, unlike the triglyceride oils typically produced by plants, and is similar to sperm whale oil.

It takes 5 years or more for a jojoba plant to produce seeds in a harvestable quantity. Approximately 20 pounds of jojoba seeds are needed to produce 1 gallon of jojoba oil. Jojoba oil is useful for a variety of purposes, ranging from cosmetics and shampoos to industrial lubricants.

The ban in 1971 on the importation of sperm whale oil and products using that oil stimulated an interest in the commercial production of jojoba oil. During the nineteen seventies and into the early nineteen eighties, jojoba oil was available only from native jojoba plants. At that time in the United States, there were only a few commercial-sized jojoba plantations, all of which were in developmental stages. Domestication studies were being conducted in the United States during that time at the University of California at Riverside and the University of Arizona, among other places.

### 2. Carole A. Whittaker

Prior to 1978, Carole A. Whittaker (Whittaker) taught mathematics and science, primarily chemistry, at the high school through college levels. Whittaker became generally interested in the jojoba plant and its seed during 1976 or 1977. She left her

teaching position in 1978 to consider entering private business and then took a sabbatical year, during which she investigated jojoba more intensively.  By the end of 1978, she had decided to plant and farm jojoba as a business.  From 1978 through 1980, Whittaker read extensively on the subject, attended international conferences on jojoba, and consulted various authorities in the field, including Dr. Demetrios Yermanos (Yermanos)[5] of the University of California at Riverside and Dr. Lemoyne Hogan of the University of Arizona.

From September 1978 through the spring of 1979, Whittaker searched for a location on which to develop a commercial jojoba plantation.  Whittaker had experience in science and project management but she had no experience in economics or business.  She therefore also sought advice during that time from friends and colleagues about how to develop a commercial jojoba enterprise.

By June 1979, Whittaker identified a section of land in Hyder, Arizona, on which to develop a commercial jojoba plantation.  At that time, with some associates, she formed Hyder Jojoba, Inc. (HJI), a subchapter S corporation organized under the laws of Arizona.  Whittaker became HJI's president and chairman and was its principal shareholder.

---

[5]    Dr. Demetrios Yermanos, a noted expert on the jojoba plant, was recognized worldwide as a leader in the domestication of that plant for commercial purposes.

During August 1979, HJI acquired a 640-acre parcel of partially developed land in Hyder, Arizona, and began farm development. A small planting of jojoba undertaken in the fall of 1979 failed. Extensive planting of jojoba plants began in the spring of 1980. HJI had planted 400 acres of jojoba by the fall of 1980. Planting of the remaining 240 acres was completed in 1981 with the help of financing provided by Hyder Jojoba Partners (HJP), a farming partnership. HJI was the general partner of HJP, provided farm management services to HJP, and leased land to HJP.

### 3. Joseph E. Berberich

Joseph E. Berberich (Berberich) is a partner in the law firm of Manning, Leaver, Bruder, and Berberich, located in Los Angeles, California. He is involved primarily in a commercial and business practice of law. His law firm was not directly involved in the transactions in issue in the instant cases.

Berberich became interested in jojoba in 1979 after reading in World Market Perspective, an industrial newsletter, an article entitled "Jojoba, Super Bean of the Future". Berberich began reading more about jojoba and decided to invest in jojoba with three of his friends who shared an interest in such a project. He traveled with those friends to a number of jojoba plantations located in Southern California and in Arizona. Berberich also read a number of private offering memoranda relating to

investments in jojoba.  He attended an all-day seminar on jojoba given by Yermanos at the University of California at Riverside.

Sometime during late 1980, Berberich met Whittaker in Los Angeles, California.  He was impressed with her scientific background and with the fact that her father was William Whittaker, founder of the Whittaker Corp., which was a publicly traded company.  Berberich traveled with his friends to Hyder, Arizona, and examined the jojoba plantation planted by HJI there. To invest in Whittaker's jojoba farming, Berberich and his associates became the first limited partners in HJP.  At that time, Berberich had no prior experience in agriculture or agricultural investments.

Whittaker, Berberich, and others believed that the successful commercialization of jojoba depended on the industry's developing a significant and stable supply of jojoba seed. Following discussions with Berberich, during late summer or early fall of 1981, Whittaker developed a preliminary proposal relating to research regarding plant selection and propagation, nutrient applications, water requirements, and pollination requirements that might be conducted in connection with a jojoba limited partnership investment.  During 1981, Whittaker and Berberich agreed that Berberich would form, and serve as the general partner of, a new limited partnership named Jojoba Development Partners, Ltd. (JDP).  The decision to form this partnership had been made, at least in principle, by the time Whittaker prepared

her draft proposal concerning research possibilities.  To be attractive to potential investors and raise the funds that HJI needed to develop its jojoba plantation, the limited partnership had to provide substantial tax benefits and had to be formed near the end of 1981.

### 4.  Jojoba Development Partners, Ltd.

### a.  The Private Offering Memorandum

With the assistance of counsel, Berberich prepared a private offering memorandum (the offering) relating to JDP.  The offering was dated November 19, 1981, and represented that a minimum of 22 and a maximum of 65 limited partnership units in JDP would be sold.  According to the offering, JDP was to be "organized to perform research and experimentation for the development of a particular strain of jojoba plant and seeds which can be planted, grown and harvested in a commercially feasible manner and which will produce a commercial yield of jojoba beans or seeds."  The offering identified HJI as the contractor selected to carry out the research and development (R & D) program under an R & D Agreement pursuant to which HJI would develop a so-called experimental plantation.  This plantation (hereafter the "small plantation") was to consist of a minimum of 160 acres and a maximum of 464 acres, depending on whether the minimum or maximum number of limited partnership units was sold on land located in the Hyder Valley of Arizona.  Potential investors in JDP were advised that the offering would be terminated and any payments

received, together with any accrued interest, would be refunded if the minimum number of limited partnership units were not sold on or before December 21, 1981, but that, if the minimum number of units were so sold by December 21, 1981, JDP would be formed and the offering would continue until the maximum number of such units was sold or until March 31, 1982, whichever occurred first.

The offering further indicated that JDP intended to determine, on or before December 31, 1986, whether to convert the small plantation into a commercial plantation for the growing, harvesting, processing, and marketing of jojoba plant material, beans or seeds, oil, and products derived from the jojoba plants. According to the offering, JDP would continue only if it decided that growing the strain of jojoba developed under the R & D program on a commercial basis was feasible, either for JDP alone or in a joint venture with HJI.

The principal investment objectives of the Partnership specified in the offering were as follows:

(1) To conduct a comprehensive research and development program on the jojoba plants on the experimental plantation with the objective of developing a strain of jojoba which can be planted, grown and harvested on a commercially feasible basis and which will produce a commercial yield of jojoba beans;

(2) If the R & D Program is successful, to convert the experimental plantation to a commercial plantation in 1987 and operate such plantation for profit;

(3) To provide cash distributions to the Limited Partners commencing in 1987, or as early thereafter as

possible, through the operation of the commercial plantation; and

(4) To generate tax losses in 1981 which can be used to offset the taxable income from other sources.[6]

In the "Investor Suitability Standards" section of the offering, potential investors were further advised that, because of the risks and benefits involved, the offering was restricted to persons who made a minimum purchase of one limited partnership unit at a cost of $50,000 per unit, unless the general partner permitted the purchase of a fraction of a unit, and who had either a net worth, exclusive of home, furnishings, and automobiles, of at least $200,000 and taxable income in 1980, some portion of which was subject to Federal income tax at a rate of 50 percent or more, or a net worth, exclusive of home, furnishings, and automobiles, of at least $300,000. Potential investors were informed that investors in higher Federal income tax brackets should be able to utilize more fully certain income tax deductions generated by JDP.

Potential investors were advised that an investor subscribing to one limited partnership unit would have to pay $15,000 in cash at the time of subscription and the balance of $35,000 by the execution and delivery of a promissory note, bearing interest at the rate of 10 percent per year on the unpaid

---

[6]    In the text we have employed the term "small plantation" to describe the initial operations of the JDP partnership instead of the pejorative term "experimental plantation" employed in the promotional literature.

principal balance, payable $15,000 on May 1, 1982, $10,000 on May 1, 1983, and $10,000 on May 1, 1984, plus any accrued interest on the note.  Potential investors were informed that the note would be on a full recourse basis to the limited partner and that, in the event of default, a limited partner would be subject to expulsion from the partnership, in the discretion of the general partner, and to deferral of his rights to return of capital.

According to the offering, the limited partners would own a collective capital percentage of 99 percent up to the point of recoupment, defined as the point at which the total of the cumulative net profits allocated to the limited partners equaled 50 percent of the total of the cumulative net losses allocated to them, after which the limited partners would own a collective capital percentage of 90 percent.  The general partner would own, as consideration for his capital contribution of $1,000, a partnership interest of 1 percent up to the point of recoupment and an interest of 10 percent thereafter.

The offering advised potential investors that, in addition to his profits interest, the general partner would receive a fee for 1981 of $10,000 as compensation for his services rendered in connection with the formation of JDP.  In addition, commencing in 1982, the general partner would receive a yearly fee as compensation for his services in managing the day-to-day affairs of JDP, in the respective amounts of $10,000 per year for 1982 through 1987, $15,000 per year for 1988 through 1992, $20,000 per

year for 1993 through 1998, and $25,000 per year thereafter until

termination of JDP.   Furthermore, the general partner would be

reimbursed for any costs he or his affiliates incurred on behalf

of the partnership, including organizational and offering

expenses, accounting and other services, and operational

expenses.

The offering further indicated that if the minimum number of

partnership units were sold and 160 acres were planted, HJI would

receive a fee of $960,000 ($250,000 in cash at execution of the

agreement and the balance payable in 1982 through 1985), while if

the maximum number of partnership units were sold and 464 acres

were planted, HJI would receive a fee of $2,784,000 ($764,000 in

cash in 1981 and the balance payable in 1982 through 1985).   The

offering, however, cautioned that:

> The Partnership will be funded with contributions of
> not less than $1,100,000 nor more than $3,250,000.  The
> size of the R & D Program will be affected by the
> amount of funds at the Partnership's disposal.  If the
> Partnership receives only the minimum amount of
> proceeds it will be able to develop a 160 acre
> experimental jojoba plantation and will have a reduced
> ability to conduct the degree of research and
> experimentation respecting propagation, watering and
> fertilizing techniques it otherwise would do and to
> complete research and experimentation on a larger seed
> population, all of which, consequently, may reduce the
> Partnership's chances of developing a superior jojoba
> plant strain.  Such a result would increase the risks
> associated with the venture.  If only the minimum or
> near minimum number of Units is sold, the Partnership
> will have to pay higher Organization and Offering
> Expenses per Unit than if it received the maximum or
> near maximum amount of proceeds from the sale of Units.
> * * *  The number of acres under the R & D Program will
> increase in accordance with the size of the offering

and dealing with a relatively fewer number of acres in the R & D Program or any subsequent commercial venture will entail additional risks of casualty, economic and environmental problems and other matters, the risks of which could be absorbed or compensated for in an R & D Program or venture with a larger number of acres in various locations.

Attached to the offering was a copy of a 33-page tax opinion letter dated November 17, 1981, issued by Kaplan, Jacobowitz, Hendricks & Bosse, P.A., a law firm located in Phoenix, Arizona, which served at that time as counsel to HJI. Projections calculated by HJI also were attached to the offering. These projections concerned the tax impact and possible returns to partners based on various estimates and assumptions derived from HJI's "past experience in developing a jojoba plantation, the relatively limited yield data available and its research respecting the cultivation of jojoba." Contrasting projections were provided on the premise of the development of a 160-acre plantation and sales of 22 partnership units and on the premise of the development of a 464-acre jojoba plantation and sales of 60 partnership units. Unexecuted copies of the certificate and agreement of limited partnership and certificate of fictitious name, subscription agreement, promissory note, offeree questionnaire, offeree representative questionnaire, research and development agreement, option and joint venture agreement, option and farm lease agreement, and farm lease were attached to the offering.

In addition to the claim of an immediate full tax deduction, the promoters of JDP made a sales presentation concerning the profit potential of the jojoba industry and the idea that the purchase of a partnership unit was a good investment. The offering, however, did not attract as many investors as the promoters had hoped. By December 21, 1981, six limited partners had each subscribed to one full partnership unit in JDP. By December 28, 1981, an additional two limited partners had each subscribed to one full partnership unit in JDP and two limited partners had each subscribed to a one-half partnership unit in JDP. No limited partner acquired a partnership unit in JDP after December 28, 1981. Berberich, in his capacity as general partner, nonetheless executed the certificate and agreement of limited partnership and certificate of fictitious name of JDP on December 31, 1981. Such certificate was recorded in the official records of Yuma County, Arizona, on December 31, 1981. Under the limited partnership agreement, no limited partner was required to make any capital contribution beyond the initial capital contribution, and no limited partner was liable for the expenses, liabilities, or obligations of JDP.

b. The Research and Development Agreement

On December 31, 1981, Berberich, as general partner of JDP, and Whittaker, as president of HJI, executed a research and development agreement (R & D Agreement). The R & D Agreement represented that HJI was experienced in the planting and

cultivation of jojoba plants and could conduct research and experimentation work relating to the scientific development of a plant strain with fast, hardy growth characteristics and high, stable seed yields, which could be planted, grown, and harvested in a commercially feasible manner. The R & D Agreement also stated that JDP anticipated that HJI would conduct such research and experimentation work. In the R & D Agreement, HJI agreed to use its best efforts to carry out the research and development program (R & D Program) described below:

2. <u>Description of Program</u>. The R & D Program to be conducted by HJI, on the terms and subject to the conditions and payments set forth in this Agreement, shall consist of the following:

2.1 <u>Experimental Plantation</u>. HJI will acquire the ownership or use of such land, buildings, machinery, equipment and other property, and will provide all personnel and materials, necessary to develop and establish an experimental jojoba plantation (the "plantation"). The plantation shall consist of <u>60</u> acres and shall be located on a site selected by HJI in the Hyder Valley area of Yuma County, Arizona. The site of the plantation may be purchased or leased from an affiliate of HJI.

2.2 <u>Plant Strain</u>. HJI will conduct original research into a particular jojoba plant strain. It will then select both propagating seeds and plant cuttings for planting and cultivation in controlled areas of the plantation. The growth characteristics of the plants will be closely observed, and replacement will be made if and when HJI determines that it is appropriate to the experimentation process and economically feasible.

2.3 <u>Cultivation Techniques</u>. The plantation will be divided into separate areas, with each area subjected to various forms of experimental husbandry. The variations will include research and experimentation in soil conditions, methods of

propagation, fertilization and watering.  Each
experiment shall be conducted in a scientific manner
and closely monitored.

2.4  Results.  The plant characteristics in each
area of the plantation and the progress of plant growth
will be recorded.  The nature and results of each
experiment conducted in the plantation will likewise be
recorded.

2.5  Conclusion.  The R & D Program will be
concluded, and HJI's obligations under this Agreement
fulfilled, on December 31, 1986.

Pursuant to the R & D Agreement, JDP agreed to pay HJI

$360,000 as full compensation for the conduct of the R & D

Program on the 60-acre jojoba plantation, of which amount $85,000

was due upon the signing of the R & D Agreement and the remaining

$275,000 was payable according to the terms of recourse notes to

be delivered to HJI upon the signing of the R & D Agreement.  The

R & D Agreement indicated that HJI had allocated $200 per acre of

the contract fee for the purchase of water and the installation

of a water delivery system for the small plantation but that JDP

would pay an additional sum, up to a maximum of $50,000, in the

event that the actual cost of providing water to the small

plantation exceeded $200 per acre.  The R & D Agreement stated

that all costs and expenses of the R & D Program were the sole

responsibility of HJI.  In addition, it stressed that all

payments due on the Notes were:

required by HJI to enable it to commence and carry out
the R & D Program, and are not in any way conditioned
on HJI's performance under this Agreement.  If HJI has
received timely payment and then fails to perform as
agreed, the Partnership may bring suit for damages or

specific performance, but further payments due under the Notes may not be withheld.  No part of any sums paid by the Partnership to HJI shall be refundable for any reason, nor shall the Partnership be entitled to withhold payment to HJI * * *.

The R & D Agreement stated that the parties did not contemplate that the R & D Program would result in any inventions or patents.  However, the agreement indicated further:

It is contemplated that the R & D Program will result in discoveries, technology and other information which may or may not be proprietary.  In any case, either party to this Agreement may use any information, discovery or technology resulting from the R & D Program in any manner and for any purpose desired.

The R & D Agreement also provided that it "is contemplated by the parties that if the R & D Program produces successful results, the small plantation will be converted into a commercial jojoba farm and thereafter operated for profit by or on behalf of * * * JDP" pursuant to certain option agreements entered into simultaneously with the R & D Agreement.  The R & D Agreement stated further that all property of any kind, real, personal, or mixed, acquired by HJI in connection with the R & D Program would be the property of HJI, and that JDP would have no interest in or rights to such property arising from the R & D Agreement or otherwise.

The R & D Agreement stated also that HJI made no representation or guarantee of any kind with respect to the R & D Program or the results thereof.  In addition, the R & D Agreement provided that HJI had not agreed to conduct the R & D Program on

an exclusive basis for JDP and was free to engage in any other activities, including other research and development, whether for itself or for others.

JDP paid all of the $360,000 contract price required under the R & D Agreement to HJI as follows. By check dated December 30, 1981, JDP paid HJI $85,000 pursuant to the R & D Agreement. On December 31, 1981, JDP issued to HJI five promissory notes bearing interest at the rate of 10 percent per year. The face amounts of the notes, dates payable, and amounts and dates of payment are as follows:

| Face Amount Payable | Date Payable | Amount Paid | Date Paid |
|---|---|---|---|
| $80,000 | 6/1/82 | $82,933.33 | 5/12/82 |
| 50,000 | 10/1/82 | 53,750.30 | 9/29/82 |
| 60,000 | 10/1/83 | 70,500.00 | 9/29/83 |
| 45,000 | 10/1/84 | 57,375.00 | 9/26/84 |
| 40,000 | 10/1/85 | [1] | [1] |

[1]Information not provided in the record.

The promissory notes contained no restrictions or nonrecourse features.

When Whittaker and Berberich signed the R & D Agreement, they both understood that HJI would not undertake for JDP all of the activities specified in section 2 of the R & D Agreement because the offering had not raised sufficient funds. Having failed to raise sufficient funds to carry out the program described in the offering circular, on December 31, 1981,

Berberich intended to form another limited partnership that he hoped would attract additional investors.

Whittaker and Berberich anticipated that any discoveries resulting from research or experimentation activities on the jojoba plants or from their domestication on the plantations operated or managed by HJI or its affiliates (hereinafter collectively referred to as Hyder Jojoba plantations) would be shared with other jojoba plantation operators so that marketable supplies of jojoba seed would be available. Whittaker recognized that any information gathered about jojoba grown in one environment might have no relevance to jojoba grown in a different environment.

### c. The Option and Joint Venture Agreement

On December 31, 1981, Berberich, as general partner of JDP, and Whittaker, as president of HJI, additionally executed an option and joint venture agreement.[7] Under that agreement, HJI was given an option, exercisable by notice to JDP not later than September 15, 1986, to undertake the conversion of the small plantation to a commercial farming operation if, not later than August 1, 1986, the parties had agreed in writing that the R & D Program had produced a strain of jojoba plant that they wished to grow on a commercial basis.

---

[7] We use the term joint venture for convenience. Such designation should not be taken as a determination of the legal effect of the option and joint venture agreement or of the nature of any farming operations undertaken pursuant to such agreement.

Under the option and joint venture agreement, if HJI exercised the option, the resulting joint venture would commence on January 1, 1987, and continue until December 31, 2011. No initial capital was to be contributed by the joint venturers. Instead, the only capital of the joint venture would be accumulated capital in the form of undistributed earnings of the joint venture. The working capital required by the joint venture for the first fiscal year would be supplied either by loans from HJI or from other lenders. No property was to be acquired by the joint venture except for cash and short term investment securities and consumables, such as propagating seed, plant cuttings, fertilizer, herbicide, and other miscellaneous supplies, to be used within 1 year. Any other property needed to conduct the business of the joint venture was to be furnished by HJI or third parties. The joint venture however was to pay HJI the fair rental value of all property furnished by HJI or its affiliates, but in no event more than it would cost to rent comparable property in the open market.

Pursuant to the option and joint venture agreement, the net profits or net losses of the joint venture would be divided among the joint venturers as follows: 90 percent to JDP until the date upon which JDP had received distributions from the joint venture in the amount equal to the principal sums (but not interest) paid by JDP to HJI under the R & D Agreement (recoupment), and thereafter 65 percent. The corresponding allocation was 10

percent to HJI until recoupment and thereafter 35 percent. Distributions were to be made to the joint venturers in the same proportion as profits and losses were to be shared.

Under the option and joint venture agreement, HJI was given sole and exclusive authority over all of the business and affairs of the joint venture. The joint venture was to have no employees at any time. Rather, all personnel required to conduct the business of the joint venture were to be furnished by HJI and would be the employees solely of HJI. The joint venture, however, was to pay HJI monthly for the direct cost of all personnel employed in the business of the joint venture plus a personnel administrative fee of 15 percent of such cost. In addition, as compensation for its services in managing the joint venture, HJI was to receive a general administrative fee in a sum equal to $150 for each acre of land devoted to the farming operations of the joint venture, plus cost of living increases.

Under the option and joint venture agreement, HJI was given the right and option any time on or after January 1, 1997, to purchase for their fair market value all rights and interest of JDP in the joint venture. The option and joint venture provided further that upon dissolution for any reason other than by such purchase:

> the affairs of the Joint Venture shall be liquidated
> forthwith. The assets of the Joint Venture shall first
> be used to pay or provide for all debts of the Joint
> Venture, including all accrued and unpaid operating
> expenses. If the assets are not sufficient to pay

these obligations, the Joint Venturers shall contribute, in the same proportion as they share profits and losses, the capital necessary to pay such obligations in full.  Thereafter, all moneys in the capital accounts of the Joint Venturers shall be paid to the Joint Venturers respectively entitled thereto.  Then the remaining assets shall be divided according to the proportionate interests of the Joint Venturers on the basis that they share in profits and losses on the date of such dissolution * * *.

During March 1983, Berberich, as general partner of JDP, and Whittaker, as president of HJI, executed an amendment to the option and joint venture agreement that, among other things, changed the distribution of profits after recoupment to 66-2/3 percent to JDP and 33-1/3 percent to HJI.  The amendment to the option and joint venture agreement in addition gave JDP the right and option between November 1, 2011, and December 31, 2011, to require HJI to purchase all of JDP's interest and rights in the joint venture.

For convenience, we shall use the name "Turtleback Jojoba Venture" hereinafter to refer to the joint venture that HJI and JDP agreed to form pursuant to the option and joint venture agreement.

### d.  The Farm Lease

On December 31, 1981, HJI entered into a farm lease with Whittaker Jojoba Corporation (Whittaker Jojoba).[8]  Under the farm

---

[8]    Whittaker formed Whittaker Jojoba during 1981.  Until it was merged into HJI in 1982 or 1983, Whittaker Jojoba owned the land and plants allocated to JDP pursuant to the various agreements that the respective parties entered into on Dec. 31, 1981.

(continued...)

lease, Whittaker Jojoba agreed to lease to HJI certain property[9] near Hyder, Arizona, for a period of 5 years commencing on January 1, 1982, at a rental of $12,000 per year. In addition, if HJI and JDP agreed to form the Turtleback Jojoba Venture, HJI was given the option under the farm lease to extend the lease term until December 31, 2011, for a yearly rental of $12,000 plus 10 percent of gross income exceeding $12,000. Gross income was defined as all income of any kind derived by the lessee from business conducted on or from the property.

### e. The Option and Farm Lease Agreement

On December 31, 1981, JDP and Whittaker Jojoba entered into an option and farm lease agreement. That agreement provided in pertinent part that, if HJI decided not to enter into the Turtleback Jojoba Venture, then, effective January 1, 1987, JDP was given an option to lease the property described in the farm lease on substantially the same terms and conditions as set forth in the farm lease. The option and farm lease agreement did not transfer to JDP any ownership rights to land, plants, equipment, or any real or personal property.

---

[8](...continued)
During 1981, shareholders of Whittaker Jojoba included, among others, Whittaker and Berberich. As a result of the merger of Whittaker Jojoba into HJI during 1982 or 1983, Berberich became a shareholder of HJI.

[9] The legal description attached to the lease describes the property as: "The westerly 1,980 feet of the north half of the northwest quarter of Section 22, Township 4 South, Range 11 West, Gila and Salt River Base and Meridian."

5.  Petitioners

a.  Petitioners Stephen H. Glassley and Judith S. Glassley

Petitioners Glassley resided in Fort Wayne, Indiana, at the time they filed their petition in the instant cases.  During 1981, petitioner Stephen H. Glassley (Dr. Glassley) worked as a physician, and petitioner Judith S. Glassley (Mrs. Glassley) worked as a medical assistant in Fort Wayne, Indiana.  Petitioners Glassley reported adjusted gross income of $72,323 on their 1981 Federal income tax return.

Dr. Glassley became interested in jojoba after reading about the plant in the Wall Street Digest, an investment newsletter written by Donald Rowe (Rowe).  Dr. Glassley had a high regard for Rowe's investment advice.  In September 1981, Dr. Glassley read more about jojoba and decided that an investment in jojoba might be a way to add to his retirement income.  Mrs. Glassley then wrote to Rowe to ask about potential jojoba investment opportunities.  In response, petitioners Glassley were provided with the names of two individuals, one of whom was Whittaker.  Berberich telephoned petitioners Glassley in response to a letter they had written to Whittaker.  Dr. Glassley was impressed by what Berberich said about jojoba and Whittaker.

Following their telephone conversation, Berberich mailed a copy of the offering circular to petitioners Glassley.  They studied the offering, including the tax opinion, and discussed it with their certified public accountant who had glanced at the tax

opinion. Dr. Glassley was impressed with Whittaker's credentials.

On December 15, 1981, petitioners Glassley subscribed to one partnership unit of JDP at a cost of $50,000. As a result of their capital contribution to JDP, petitioners Glassley acquired an 11.1-percent capital interest in JDP. Also on December 15, 1981, they executed the signature page to the certificate and agreement of limited partnership and certificate of fictitious name, offeree questionnaire, and a promissory note in the amount of $35,000 payable to JDP in installments of $15,000 on or before May 1, 1982, $10,000 on or before May 1, 1983, and $10,000 on or before May 1, 1984, together with interest of 10 percent per year of the unpaid balance. Petitioners paid to JDP or its escrow agent $15,000 on December 15, 1981, $16,160 on April 26, 1982, $12,000 on April 29, 1983, and $11,000 on April 30, 1984.

Dr. Glassley maintained his interest in the jojoba plant and its commercialization. He continued to read about jojoba and together with Mrs. Glassley attended an international conference on jojoba held in Tucson, Arizona, during 1982. Petitioners Glassley also traveled to Hyder, Arizona, and visited the jojoba plantation during 1982, 1983, and 1985.

Dr. Glassley would not have invested in JDP if he had thought the joint venture would not be formed. He was interested in making a profit from his investment and believed that there could be no profits without the formation of the joint venture.

According to Dr. Glassley, he expected to recoup his investment in JDP and earn a few thousand dollars each year for at least 20 years as a result of the commercialization of the jojoba plantation. He also was aware of and attracted by the potential tax benefits outlined in the offering with respect to an investment in JDP.

On their 1981 Federal income tax return, petitioners Glassley claimed a net loss relating to JDP of $40,530, resulting in a tax benefit of approximately $20,000. By notice of deficiency dated March 17, 1989, respondent disallowed the partnership loss relating to JDP that petitioners Glassley had claimed for 1981 on the grounds that they had not established:

(1) The claimed amounts arose from transactions that had a bona fide business/economic purpose or substance, or intent to make a profit apart from the intended tax consequences of such transactions;

(2) The research and development expenses were not [sic] incurred in connection with a trade or business within the meaning of Internal Revenue Code Section 174;

(3) The expenses claimed by the partnership were incurred or paid by the partnership, or if incurred or paid, the expenses were not [sic] ordinary and necessary business expenses;

(4) Your basis in the partnership is sufficient to entitle you to claim a partnership loss deduction, or;

(5) The partners are "at risk" within the meaning of Internal Revenue Code Section 465.

b.  Petitioner Paul S. Mahoney

Dr. Mahoney resided in Los Angeles, California, at the time he filed his petition in the instant cases.  During 1981, he worked as a physician.  Dr. Mahoney reported adjusted gross income of $175,155 on his 1981 Federal income tax return.

On December 11, 1981, Dr. Mahoney subscribed to one partnership unit in JDP for a price of $50,000.  As a result of his capital contribution to JDP, Dr. Mahoney acquired an 11.1-percent capital interest in JDP.  Also on December 11, 1981, he executed the signature page to the certificate and agreement of limited partnership and certificate of fictitious name, offeree questionnaire, and a promissory note in the amount of $35,000 payable to JDP in installments of $15,000 on or before May 1, 1982, $10,000 on or before May 1, 1983, and $10,000 on or before May 1, 1984, together with interest of 10 percent per year of the unpaid balance.  Dr. Mahoney paid to JDP or its escrow agent $15,000 on December 15, 1981, $16,160 on April 18, 1982, $12,000 on April 18, 1983, and $11,000 on May 1, 1984.

On his 1981 Federal income tax return, Dr. Mahoney claimed a net loss relating to JDP of $40,529.  By notice of deficiency dated June 21, 1989, respondent disallowed the partnership loss relating to JDP that Dr. Mahoney had claimed for 1981 on the grounds that he had not established:

> any amount was paid pursuant to a research and
> development agreement or, if paid, that such
> expenditures were not preconceived shams lacking
> economic substance.

Alternatively, the amount deducted by the partnership as research and development expenses has been disallowed because it has been determined that such expenditures do not meet the requirements of I.R.C. Section 174.

In the further alternative, the amount deducted by the partnership as research and development expenses has been disallowed because it has not been established that a profit motive existed when such amounts were paid and that the transaction was entered into other than solely for tax purposes.

In the further alternative, the amount deducted by the partnership as research and development expenses has been disallowed because you have not established:

(1)  That the accrual method is a proper method for accounting for research and experimental expenditures, or

(2)  That the use of the accrual method by said partnership clearly reflects partnership income.

In the further alternative, you have not established that the portion of the amount deducted by the partnership as research and experimental expenses that is attributable to the note presented by said partnership is not contingent or that all events have occurred which fix the liability thereof.  See I.R.C. Section 465.

Dr. Mahoney also was a partner in HJP.  On his 1981 Federal income tax return, he claimed a net loss relating to HJP of $30,172.

Dr. Mahoney did not testify at trial.

c.  Petitioners Edward F. Houser, Jr. and Kathryn G. Houser

Petitioners Houser resided in Lubbock, Texas, at the time they filed their petition in the instant cases.  During 1981 and 1982, petitioner Edward F. Houser, Jr. (Dr. Houser) worked as a physician, and petitioner Kathryn G. Houser worked as a realtor.

Petitioners Houser reported adjusted gross income of $79,103.92 on their 1981 Federal income tax return and $142,708 on their 1982 Federal income tax return. Dr. Houser retired from the practice of medicine in 1991.

Dr. Houser first became interested in investing in jojoba during 1978 or 1979 after reading articles about the plant in a number of investment newsletters. During 1981, he read Rowe's jojoba-related articles in the Wall Street Digest. Dr. Houser wrote to Rowe, and was referred to Whittaker. Dr. Houser was impressed with her credentials and telephoned her. She referred him to Berberich, who subsequently sent Dr. Houser a copy of the offering circular.

Dr. Houser studied the offering, including the tax opinion. He discussed the offering with his certified public accountant, who did not raise any concerns about the potential investment. Dr. Houser also discussed the offering with his brother, an attorney, who told Dr. Houser that the law firm issuing the tax opinion was reputable and that, in the brother's opinion, the offering looked promising.

On December 28, 1981, petitioners Houser subscribed to one partnership unit of JDP at a total cost of $50,000. As a result of their capital contribution to JDP, petitioners Houser acquired an 11.1-percent capital interest in JDP. Also on December 28, 1981, they executed the signature page to the certificate and agreement of limited partnership and certificate of fictitious

name, offeree questionnaire, and a promissory note in the amount of $35,000 payable to JDP in installments of $15,000 on or before May 1, 1982, $10,000 on or before May 1, 1983, and $10,000 on or before May 1, 1984, together with interest of 10 percent per year of the unpaid balance.  Petitioners Houser paid to JDP or its escrow agent $15,000 on December 28, 1981, $16,160 on April 26, 1982, $12,000 on April 23, 1983, and $11,000 on April 27, 1984.

Dr. Houser was enthusiastic about the jojoba plant's product development and profit potential.  Petitioners Houser traveled to Hyder, Arizona, and visited the jojoba plantation during 1984 or 1985.

Dr. Houser was interested in making a profit from his investment in JDP.  According to Dr. Houser, he believed that, after the jojoba plantation was commercialized and the crop matured, income from his investment would supplement his retirement income and help build an estate for the benefit of his children and grandchildren.  Dr. Houser would not have invested in JDP if he had not believed that the joint venture would be formed and that it would be profitable.  He also was aware of and attracted by the potential tax benefits outlined in the offering of an investment in JDP.

On their 1981 Federal income tax return, petitioners Houser claimed a net loss relating to JDP of $40,529, resulting in a tax benefit of approximately $20,000.  On their 1982 Federal income tax return, petitioners Houser claimed a net loss relating to JDP

of $320, resulting in a tax benefit of approximately $160.  By
notice of deficiency dated August 21, 1989, respondent disallowed
the partnership losses relating to JDP that petitioners Houser
had claimed for 1981 and 1982 on the grounds:

> 1.  It has not been established that the
> partnership is engaged in a trade or business or that
> the partnership engaged in the activity with the
> primary purpose of making a profit.

> 2.  It has not been established that any claimed
> deductions for research and development expenses
> represent an expenditure for or related to research and
> development actually undertaken.

> 3.  It has not been established that the amount
> proven to be expended, if any, in relation to alleged
> research and development are currently deductible and
> are not capital expenditures.

> 4.  It has not been established that you had any
> amount at risk, as defined by Section 465 of the
> Internal Revenue Code.

> 5.  It has not been established that purported
> transactions contained any economic reality or
> substance.

> 6.  It has not been established that the accrual
> method of accounting clearly reflects the partnership
> income.

> 7.  It has not been established that any amount
> deducted for research and development expenses was paid
> or incurred in connection with the partnership's trade
> or business.

## B.  The Jojoba Plantation

For convenience, we use the name "Turtleback I" hereafter to
refer to the 80-acre jojoba plantation for which the expenses at
issue in the instant cases ostensibly were incurred.  HJI
purportedly allocated 60 of those acres to JDP and the other 20

acres to Jojoba Development Partners, Ltd. II (JDP-II), a limited partnership formed by Berberich in 1982. HJI also developed an additional adjacent 40-acre field of jojoba for JDP-II.[10]

Berberich spoke with Whittaker regularly by telephone and visited the Hyder Jojoba plantations once or twice a year. In addition, he spoke with her at the international jojoba conference held in Tucson, Arizona, in 1982, and at a seminar held in Los Angeles, California, which was sponsored by the Arizona Growers Association. In addition, on occasion Whittaker sent to Berberich written progress reports or other correspondence related to jojoba and the jojoba plantations purportedly allocated to JDP and JDP-II. Berberich periodically reported to the JDP limited partners on matters relating to the partnership.

When acquired, Turtleback I was a raw parcel of land. During January and February 1982, the field was surveyed, cleared of brush, and laser graded. A water delivery system was installed and one-half mile of concrete ditch was laid. During March the field was prepared for planting by ripping, land-planing, listing (plowing), pre-irrigating, and relisting. Turtleback I was planted with jojoba seed on March 19, 1982. For that purpose, HJI used seed only from native jojoba plants that

---

[10] In addition to JDP and JDP-II, HJI managed jojoba plantations, and served as research and development contractor, for at least 3 other designated research and development partnerships in Hyder, Ariz. The record does not reveal who promoted or served as general partner of those partnerships.

were growing in Superior, Arizona. HJI treated some of those seeds with fungicide and/or germination hormones during the planting period but observed no measurable differences in the plants as a result of such treatment.

HJI undertook a program to vary the nutrients to be applied to the jojoba plants on Turtleback I. Whittaker and Berberich anticipated that varying the nutrient applications would help HJI discover how to use nutrient applications to increase seed productivity of jojoba plants and thereby increase profits.

In the first written progress report to Berberich as general partner of JDP, dated August 26, 1982, Whittaker advised JDP, among other things:

> Due to the limited size of the R & D program under contract with Jojoba Development Partners, it will not be possible to carry out all of the R & D projects planned for a 454-acre project. The 80-acre planting for JDP (and JDP II) will allow us to do an excellent study on the effects of various nutrient applications. Commencing this month we are dividing Turtleback I into 10 experimental plots and intend to apply the following treatments:

> 1.  Control:  no treatment
> 2.  Nitrosul:  applied in irrigation water
> 3.  Urea:  applied directly to plant roots through soil
> 4.  Urea:  foliar application
> 5.  Ammonia:  applied directly to plant roots through soil
> 6.  Micronutrients:  applied foliarly
> 7.  Numbers 6 and 2 combined
> 8.  Numbers 6 and 3 combined
> 9.  Numbers 6 and 4 combined
> 10.  Numbers 6 and 5 combined

> The foliar applications will not begin until at least spring of 1983 when there is new growth on the plants.

I expect that it will take at least three years before we will be able to observe any measurable differences from these various treatments.  What we will be looking for are differences in the rate of plant growth, seed yield, leaf tissue analysis and oil content of seeds.

In the second written progress report to Berberich as general partner of JDP, dated May 24, 1983, Whittaker advised JDP, among other things, that:

In recent months I have had the opportunity to discuss Jojoba Development Partner's R & D program in detail with Drs. Dave Palzkill and Bill Feldman at the University of Arizona, with the technical representatives of our agri-chemical supply company and with our farm staff.  Dave Palzkill commented on the need for growers in various areas to carry out R & D programs such as this and suggested that we compare notes with Bob Roth of the U of A Extension Services Station.  Dr. Palzkill recommended that, rather than than [sic] study response to different forms of nitrogen (in ammonia vs. nitrate vs. urea) or methods of application (in water, soil or foliarly), we would do better to study varying amounts over a wider range than we had anticipated and to include response to phosphorus in the program.  He also pointed out the need to replicate all trials in the two separate plots.

Following Dr. Palzkill's recommendations, Whittaker revised the nutrient application program planned for Turtleback I. Consequently, the 80 acres of Turtleback I were divided into 14 plots of jojoba plants with 15 rows each.  Seven application formulations were devised for those 14 plots, consisting of varying amounts of nitrogen and phosphate and varying application periods during the year.  Each application formulation was then applied to 2 of the 14 plots.  The primary purpose of the seven application formulations was to test how to use nutrient

applications to increase the yield and profitability of jojoba production.

During 1983, Whittaker, on behalf of HJI, contracted with Inter Ag Services, Inc. (IAS), headed by Dr. Paul J. Eberhardt (Eberhardt), to conduct periodic leaf tissue analyses to measure the effect of the nutrient applications on the jojoba plants. The leaf analyses indicated that the nitrogen and/or phosphate applications had no discernable effect on the jojoba plants growing on Turtleback I. Results from nutrient applications to jojoba plants growing in other locations, such as in Desert Center, California, and at the University of Arizona jojoba research site, however, had indicated that those jojoba plants responded positively to nitrogen and/or phosphate applications. It is common for crops in different environments to respond differently to nutrients.

Subsequently, HJI contracted with IAS in February 1985, for a total contract price of $16,262, to conduct some nutrients tests to try to determine, among other things, why the jojoba plants on Turtleback I were not responding to the nitrogen and phosphorous as had been expected. Some of the services performed by IAS for HJI related to the effects on the jojoba plants of other nutrients, such as zinc, iron, magnesium, and copper, and were associated with JDP-II. One of the projects undertaken by IAS for HJI was performed on jojoba plants that were not located on Turtleback I. The work performed by IAS confirmed that

additional nitrogen and phosphate applications did not benefit the jojoba plants on Turtleback I.[11]  Consequently, HJI discovered that it would not need to incur costs relating to the application of those additional nutrients to jojoba grown on Turtleback I.  As a result of the jojoba leaf tissue analyses, HJI also learned that the appropriate nutrient levels for a jojoba plant varied seasonally.  HJI continued the nutrient field testing on the jojoba plants on Turtleback I beyond December 31, 1986, the expiration date for the R & D Agreement.

In July 1986, HJI and JDP executed an agreement regarding the option and joint venture agreement in which both parties expressed their consensus that the jojoba growing on Turtleback I could be farmed on a commercial basis and that Turtleback I should be converted to a commercial jojoba plantation. Subsequently, on September 11, 1986, Whittaker notified JDP that HJI had exercised its option to convert Turtleback I to a commercial farm and form Turtleback Jojoba Venture with JDP pursuant to the option and joint venture agreement.  During 1987 and 1988, HJI operated Turtleback I as a commercial jojoba

---

[11]    Dr. Eberhardt gave reports on the nutrient tests at various meetings of the Jojoba Growers Assoc.  In addition, during Jan. 1988, he presented an article at the seventh international conference on jojoba, held in Phoenix, Ariz., in which he relied on information gathered from the leaf analyses of jojoba plants grown on the Hyder Jojoba plantations.  As a result, that information is now being used as a guide or baseline for determining the health of jojoba plants grown in other parts of the world.

plantation and sold jojoba seeds harvested from jojoba plants growing there under the name Turtleback Jojoba Venture.

For 1987, Turtleback Jojoba Venture reported a net farm loss of $43,929 on Schedule F of its U.S. Partnership Return of Income, Form 1065. For 1988, Turtleback Jojoba Venture reported a net farm profit of $3,890 on Schedule F of its U.S. Partnership Return of Income, Form 1065.[12]

At the same time that HJI exercised its option to enter into Turtleback Jojoba Venture with JDP, HJI exercised an option to convert the jojoba plantation purportedly allocated to JDP-II to a commercial jojoba plantation and to enter into a joint venture with JDP-II (Turtleback Jojoba Venture II). Thereafter, HJI treated Turtleback Jojoba Venture and Turtleback Jojoba Venture II as one jojoba plantation (TJV).

During late 1987, Whittaker informed Berberich that the TJV plantation was in good condition and had excellent prospects for producing profitable yields of jojoba seeds, but that TJV was out of funds. She also indicated that harvesting efficiency was unacceptably poor and that it would probably take several years of continued development of machinery, equipment, and systems before harvesting efficiency would be substantially improved. In

---

[12] In the Schedule F for 1988, Turtleback I Venture reported a farm rent expenditure of only $3,500, rather than the minimum $12,000 rental fee required under the farm lease. Had Turtleback I Venture reported the full $12,000 rental fee, the Schedule F would have reflected a net farm loss of $4,610.

addition, she indicated that, although the market price and

demand for jojoba oil were strong and were expected to remain so:

> The jojoba industry in general is reflecting the same
> kind of problems that are being experienced by HJI and
> its affiliates.  Virtually all jojoba producers are
> experiencing cashflow problems.  Several more years are
> required than were originally predicted to reach
> commercial production.  The development of efficient
> harvesting, although steady, has delayed cashflow even
> further.  In most cases, the capital required to attain
> positive cashflow is exceeding the amount committed by
> the original investors and the sources for obtaining
> additional funding are severely limited.

Whittaker further suggested, as an alternative to the dissolution

of TJV or the provision by the JDP and JDP-II limited partners of

a working capital loan, a plan:

> calls for the combination of up to 3,000 acres of
> plantations in the Hyder area into a single company
> (which, for want of a better name, we will currently
> call "NUCORP").  A key objective of the plan is to
> develop an entity which is capable of attracting new
> investment capital while preserving the capital of the
> original investors.  Under this plan, HJI and all of
> the Partnerships with which HJI is affiliated will be
> invited to contribute their assets to NUCORP in
> exchange for stock in the company.  Cash will be raised
> from both existing partnerships and new investors.  All
> partnerships will have the opportunity to preserve
> their relative equity positions.  However, in order to
> attract new investment capital, the interests of all
> previous capital will have to be subordinated to any
> new contributions.
>
> The formation of such an entity creates a viable
> vehicle for funding and managing a number of
> plantations which might otherwise fail.  The Company
> will attract new investment capital by offering a
> preferred position and lower risk to potential new
> investors.  It will be capable of borrowing funds by
> using certain personal guarantees of new key investors
> as well as its assets as collateral for such loans.
> NUCORP should post a profit by 1989 and show
> significant cashflow within a 3- to 5-year period.  By
> then, the Company will have several alternatives

including being a favorable candidate for acquisition by a larger company or of becoming publicly traded and expanding rapidly to meet increasing demand for jojoba oil.

Berberich notified the limited partners of JDP and JDP-II of Hyder Jojoba plantations' cash flow problems by letters dated December 21, 1987, and February 10, 1988. In those letters he endorsed Whittaker's plan to form a corporation that would combine into one entity all of the entities then comprising the Hyder Jojoba plantations. Subsequently, effective June 30, 1988, the partners of JDP exchanged their partnership interests for stock in a new corporation, HJI Holdings, Inc. (Holdings). Petitioners accordingly became shareholders in Holdings. As a result of the exchange, JDP realized ordinary income from liabilities assumed on the exchange in the amount of $58,495, which was reflected on its final partnership tax return, filed for 1988. In connection with the creation of Holdings, the partners of JDP and JDP-II were credited with raising capital of $116,355.49 from sale of the assets of the partnerships and additional contributions made by partners.[13] As a part of the reorganization, Holdings owns all of the land and assets that HJI or entities affiliated with HJI had owned. Following the reorganization, Holdings farmed approximately 1,300 acres of jojoba in the Hyder Valley.

_____

[13] The record does not reveal whether any of the petitioners made any additional capital contributions.

C. The Consequences of Petitioners' Initial Investment

JDP used the calendar year and the accrual method of accounting to report its income on its U.S. Partnership Return of Income, Form 1065, for calendar year 1981 (1981 partnership return). On the 1981 partnership return, JDP deducted, among other things, $360,000 for research and experimental expenditures. JDP reported a net loss of $368,452[14] on the 1981 partnership return, a proportionate amount of which was passed through to each partner of JDP.

From the inception of JDP, its partners intended and expected HJI to farm jojoba commercially on Turtleback I. For the partners to realize a return of their investment in JDP, commercial farming operations had to be conducted on Turtleback I.

HJI had sole responsibility for the farming operations on Turtleback I. The $360,000 JDP agreed to pay HJI under the R & D Agreement was based on a fixed contract price. HJI placed the $360,000 in its general funds. HJI used the $360,000, among other purposes, to pay the farm lease payments to Whittaker Jojoba, to prepare the land for farming, including installing the irrigation system, to purchase jojoba seeds, and to plant and

---

[14]     JDP reported no income on its 1981 partnership return. In addition to the $360,000 it deducted for research and experimentation expenditures, JDP deducted $6,250 for legal fees, $2,000 for accounting fees, and $202 for amortization of organization costs.

cultivate those seeds. HJI activities did not result in any patentable technology, nor was any patentable technology expected to be developed from those activities. JDP had no right under any of the various agreements entered into during 1981, or amendments thereto, to share in any profits from Turtleback I before January 1, 1987, following the formation of Turtleback Jojoba Venture.

During 1988 through 1992, the Hyder Jojoba plantations produced substantial amounts of jojoba seed. During 1987, HJI harvested 76,848 pounds of jojoba seed from 942 acres of jojoba plants. During 1988, it harvested 354,615 pounds of jojoba seed from 1,162 acres.

As of the date of trial, however, a stable market for jojoba seed or oil had not evolved and demand for the jojoba seed did not expand to the extent expected. For some products, less expensive synthetic substitutes for jojoba oil were developed that adversely affected the demand for jojoba seeds. Consequently, prices for jojoba seeds and oil have fallen. In May or June 1993, Holdings cut off irrigation to the jojoba plants because it had insufficient cash flow to continue operations. As a result, as of the date of trial, the income potential for Turtleback I was small.

None of the JDP limited partners ever have recovered their initial investment in JDP. As of the date of trial, the limited partners continued to hold their interests in Holdings.

D.  The Experts

1.  Paul H. Gross

Paul H. Gross (Gross) testified for petitioners relating to the value of any research or experimentation services that were to be provided by HJI to JDP pursuant to the R & D Agreement. Gross is employed by American Appraisal Associates, which is located in Atlanta, Georgia.  He has professionally valued fertilizer companies, formulations of fertilizer, application methods of fertilizer, devices for the applications of fertilizers, patents thereon, hybrid seed corn varietal strains, germ plasm pools, and the like.  Gross is qualified to testify in the instant cases as an expert on valuing research and development contracts.  Gross concluded that as of December 31, 1981, the value of the R & D Agreement was $382,000.

According to Gross, the value of the contract at its inception depended on the qualification of the contractor who was to perform the services, the plan of activity incorporated in the contract, and the reasonableness of the payments to be made under the contract.  In his view, HJI was qualified to perform the research or experimentation services, based on HJI's and Whittaker's background, their experience in operating a commercial jojoba plantation in the Hyder Valley of Arizona, and their contacts with qualified technical experts.

Gross used a cost approach to assess the reasonableness of the payments under the contract.  To estimate the reasonableness

of the costs to be performed under the R & D Agreement as of

December 31, 1981, Gross made an analysis of each aspect of the

costs to be incurred in fulfilling that agreement.  For that

purpose, Gross first noted that neither HJI nor Whittaker had

prepared a cost estimate at the time the project was first

entered into nor a project plan outlining what was going to be

done for the consideration.  He also established that at the

outset of the project there was no cost accounting system that

would specifically identify the costs allocated to JDP.  Gross

therefore used data that Whittaker had maintained for 1984

through 1989 to estimate for each activity[15] the per acre

contract expenditures that would be required under the contract

on a year-by-year basis.  He quantified these costs on a 60-acre

---

[15]    Gross segmented the activities under the R & D Agreement for 1981 through 1984 as follows:

For 1981-82:  Project planning; land acquisition; land clearing and planing; installation of irrigation; construction of the pilot model; initial planting.

For 1983-84:  Cultivation; fertilization (including analysis and tissue analysis); irrigation; plant growth analysis; harvesting; yield analysis.

For 1985-86:  Cultivation; irrigation; fertilization analysis; tissue analysis; harvesting; yield analysis.

basis and accumulated those total costs throughout the 5-year period of the contract.  Gross calculated the aggregate amount of those costs to be about $382,000.[16]

In addition, to check the reasonableness of his cost method analysis and in the absence of a demonstrable income stream,

---

[16]    Because of a poorly reproduced exhibit, we had considerable difficulty in deciphering the schedule submitted by Gross in his report in support of his calculation of aggregate costs of $382,000.  Our best approximation of the amounts reflected on that exhibit are as follows:

Estimated Annual Contract Expenditures by HJI
(And Its Subcontractors) in Performing
Research and Experimentation Services

| | Year | | | | |
|---|---|---|---|---|---|
| | 1982 | 1983 | 1984 | 1985 | 1986 |
| Land Use Charge | $129.25 | $129.25 | $129.25 | $129.25 | $129.25 |
| Hourly Labor | 61.76 | 123.51 | 123.51 | 123.51 | 75.44 |
| Equipment Use | 20.30 | 40.59 | 40.59 | 40.59 | 41.44 |
| Irrigation | 125.76 | 126.76 | 125.76 | 125.76 | 108.82 |
| Chemicals | 16.80 | 33.50 | 33.50 | 33.50 | 58.16 |
| Contract Labor | 13.24 | 25.48 | 25.48 | 25.48 | 6.44 |
| Harvesting Labor | - | - | 128.00 | 128.00 | 128.00 |
| Consulting (Modeling Year 1 Only - 5 Months effort) | 1,466.67 | 3.20 | 3.20 | 3.20 | 9.25 |
| General Farm Maintenance | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 |
| Farm Management | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| Sub-Total | 1,899.78 | 548.29 | 675.29 | 675.29 | 622.80 |
| Administrative and Overhead | 379.96 | 109.78 | 136.38 | 136.38 | 124.56 |
| Sub-Total | 2,279.74 | 658.07 | 811.67 | 811.67 | 747.36 |
| Profit | 455.96 | 131.61 | 162.33 | 162.33 | 149.47 |
| Sub-Total | 2,735.69 | 789.68 | 974.00 | 974.00 | 896.83 |
| Total [for 60 acres (rounded)] | $164,141 | $47,381 | $58,440 | $58,440 | $53,810 |
| 5-year Total | $382,212 | | | | |
| Per Acre Total | $6,370 | | | | |

Gross used a cost savings approach; in other words, "the calculation of the benefit derived from the research performed and conversion of that savings into a value amount."  Gross classifies this approach as in a broad category of an income approach.  According to Gross, for the cost savings approach, he valued as of December 31, 1986, the discoveries made from the cost savings that he calculated.

For his cost savings approach, Gross relied on Eberhardt's conclusion that the leaf tissue analyses performed by IAS for HJI indicated that the amount of nitrogen and phosphate routinely being applied to the jojoba plants on Turtleback I was not justified.  Gross calculated the savings from not applying the unneeded fertilizer to be $38 savings per acre, based on $26 of savings per acre for nitrogen and $12 per acre for phosphate.  He then used a 10-percent capitalization rate to determine a total per acre savings value of $380 from not applying unnecessary nitrogen and phosphate.

In his report, Gross opined that:

> It is not customary to conduct expensive research and experimentation on a pilot model, and then expect the pilot operation to provide for recovery of such expense.  Rather, the discoveries derived from research and experimentation performed at a relatively small cost on a pilot model are thereafter utilized in large-scale production to produce large-scale cost savings.

Gross consequently concluded that the value of the discoveries in 1986 from the nutrient tests were most applicable to a large producer of jojoba.  He estimated that such a major jojoba

producer would save at least $380,000 from the nonpurchase of nitrogen and phosphate as a result of the nutrient tests conducted on Turtleback I, based on his calculated $380 savings per acre times 1,000 acres. The 1,000 acres represent his estimate that a major jojoba producer such as HJI would have 1,000 acres or more of jojoba under cultivation.

In preparing his report, Gross did not consider any of the various contractual relationships that existed between JDP and HJI. He did not attribute any value in preparing his report to the fact that a contractual joint venture opportunity existed between HJI and JDP.

### 2. Paul J. Eberhardt

Eberhardt testified for petitioners as to the nature of any research or experimentation activities that HJI may have conducted on Turtleback I during the R & D period. As stated earlier, Eberhardt is the head of IAS. Eberhardt has a bachelor of science degree in agricultural research, with a minor in chemistry; a master of science degree in soils, with a minor in statistics and plant physiology; and a doctor of philosophy degree in agricultural chemistry and soils, with a minor in plant physiology. He is qualified as an expert in agronomics and agricultural research and experimentation. Eberhardt concluded that the totality of research or experimentation activities performed by HJI (including activities allegedly performed for JDP-II) was research in the experimental or laboratory sense, and

was activity to discover information that would eliminate uncertainty regarding the commercialization of jojoba plantations. Eberhardt was not aware of the manner in which HJI purportedly allocated different plots of jojoba plants to various limited partnerships. As far as he knew, IAS performed its services for HJI.

### 3. Marvin T. Parr

Marvin T. Parr (Parr) testified for respondent as to the merits of any research or experimentation activities HJI may have conducted for JDP. Parr is an engineer employed by the Internal Revenue Service in Montgomery, Alabama. He visited the TJV plantations and inspected the growing jojoba. He is qualified to testify as an expert in the instant cases as to the matters set forth in his report.

Parr concluded that the activities performed on Turtleback I between January 1, 1982, and December 31, 1986, were predominately aimed at the creation of an existing mature jojoba farm and were not simply directed at acquiring information about jojoba that was unknown at the time. He also concluded that the activities would not have eliminated any uncertainty regarding the commercialization of jojoba because during that period jojoba was being grown in other locations both without and within the United States, and there were conflicting results about the benefits of nutrients, especially with respect to nitrogen. The conflict in the results was that in some locations the jojoba had

responded favorably to nitrogen in the growth of the plants and, in some instances, in yield of seeds, while in other locations the growers had found no effect from applying nitrogen.

Parr agreed, however, that some of the activities performed on Turtleback I during the period in question would be research activities. He agreed that some of the fertilizer trials, such as the original nutrient application program begun in the spring of 1983, the revised nitrogen and phosphate application in mid-1983, as well as the IAS nutrient study in 1985,[17] were valid research conducted under proper experimental procedures.

According to Parr, before any experimental activities commenced, a number of capital improvements had to be undertaken, including the clearing and removal of brush, the leveling and grading of the land surface, the installing of irrigation supply piping to and on the tract, and the installing of a concrete-lined irrigation ditch on the tract. Other expenditures relating to establishing the jojoba stand, such as planting the seed and irrigating the field to cause the seed to germinate and the plants to grow also were undertaken before any experimental activities began. Parr concluded that only a minor portion of the expenditures on Turtleback I related to actual research. The

---

[17]    However, Parr would disregard as irrelevant to JDP all but a small part of the research conducted by IAS because that research was not identified in the R & D Agreement, was not performed using jojoba plants from Turtleback I, or was not carried out on Turtleback I.

bulk of the such activities was related to the creation and development of a commercial jojoba plantation.

Parr estimated that, without cost documentation, the expenses actually related to research activities would be less than 20 percent of the expenses that went into the acquisition and creation of the jojoba plantation.  He would exclude from research expenditures such as the land lease, planting, irrigation, and other cultivation practices performed during the 5-year R & D period because those activities would be required regardless of any research.  According to Parr, nutrient study costs include only the actual application of the nutrients and the recordkeeping of the period of time when those nutrient applications were made and the dissemination of the results at the end of that time.  They do not include the cost to create the plantation, which includes among other things, the land, the jojoba plants, and the irrigation system.

Parr also concluded that any research activities would not have been proprietary because the results already were known and such knowledge was widely disseminated among the growers since, at that time in the development of the jojoba industry, the growers were not keeping secrets from one another and they were freely sharing information, including knowledge of irrigation, fertilizer, and pruning.

OPINION

## A. The Criteria That Must Be Satisfied for Expense Treatment Under Section 174

Section 174(a)(1)[18] states, as a general rule, that "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business", may, at the election of the taxpayer, be treated as expenses not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. Sec. 174(a)(1). A taxpayer is entitled to a deduction for research and experimental expenditures with respect to expenses paid or incurred by the taxpayer directly as well as expenses paid or

---

[18] Sec. 174 provides in pertinent part:

SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

(a) Treatment as Expenses.--
    (1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

    *     *     *     *     *     *     *

(c) Land and Other Property.--This section shall not apply to any expenditure for the acquisition or improvement of land, or for the acquisition or improvement of property to be used in connection with the research or experimentation and of a character which is subject to the allowance under section 167 (relating to allowance for depreciation, etc.) or section 611 (relating to allowance for depletion); but for purposes of this section allowances under section 167, and allowances under section 611, shall be considered as expenditures.

incurred on the taxpayer's behalf by another person or organization. Stankevich v. Commissioner, T.C. Memo. 1992-458; sec. 1.174-2(a), Income Tax Regs.

1. The Expenditures Must Be for Research or Experimentation

The term "research or experimental expenditures" as used in section 174 means expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. Sec. 1.174-2(a)(1), Income Tax Regs. This regulation further provides:

> The term [research or experimental expenditures]
> includes generally all such costs incident to the
> development of an experimental or pilot model, a plant
> process, a product, a formula, an invention or similar
> property, and the improvement of already existing
> property of the type mentioned. The term does not
> include expenditures such as those for the ordinary
> testing or inspection of materials or products for
> quality control or those for efficiency surveys,
> management studies, consumer surveys, advertising, or
> promotions. * * *

We have found the above definition "to be reasonable and consistent with the intent of the statute to limit deductions to those expenditures of an investigative nature expended in developing the concept of a model or product." Mayrath v. Commissioner, 41 T.C. 582, 590 (1964) (emphasis in original), affd. without discussion on this issue 357 F.2d 209 (5th Cir. 1966).

In the instant cases, petitioners contend that HJI was conducting valid research or experimentation on behalf of JDP

and, consequently, under section 174 JDP is entitled to deduct the contract fee it paid HJI for such research or experimentation. Respondent contends, on the other hand, that HJI used the funds JDP paid it to create a valuable capital asset in the form of a jojoba plantation, including expenditures for lease payments, site preparation such as ripping the land, plowing, discing, and purchasing and installing an irrigation system, and for planting the jojoba seeds. Respondent argues that such expenditures were made for the improvement of land to which JDP could gain a property interest and, hence, under section 174(c) the expenditures are not allowable.

Petitioners counter, however, that JDP did not acquire an ownership interest in the land, jojoba plants, or equipment used on Turtleback I, or in any other property, as a result of the disputed expenditures. Petitioners assert that under section 1.174-2(a)(1), Income Tax Regs., any costs HJI incurred to build the jojoba plantation on Turtleback I are deductible as costs associated with building "a pilot model". Petitioners assert further that respondent's expert Parr acknowledged that HJI

performed at least some qualifying research on JDP's behalf that
was experimental in nature.[19]  Petitioners contend that, given
Parr's admission that the nutrient study had to occur on an
existing jojoba plantation, and that all of Turtleback I was used
for the qualifying research, under section 1.174-2(a)(1), Income
Tax Regs., the Commissioner must allow petitioners to deduct the
expenditures associated with the development of the purported
"model" jojoba plantation.  We do not agree.

Any business arrangement may be scrutinized to ascertain
whether its form comports with economic reality.  Estate of
Helliwell v. Commissioner, 77 T.C. 964, 983 (1981); see Frank
Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Commissioner
v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering,

---

[19]    On brief, respondent concedes that some of HJI's activities
connected with the jojoba plants, specifically relating to
nutrient studies, did constitute research and experimentation.
Respondent maintains, however, that less than 20 percent of HJI's
efforts on the property ostensibly allocated to JDP constituted
research and experimentation.  Respondent does not concede that
the expenditures were incurred in connection with JDP's trade or
business.  In light of respondent's concession, we make no
determination here as to whether HJI's activities on Turtleback I
rose to the level of research and experimentation as contemplated
under sec. 174.  However, even if research and experimentation
did occur on Turtleback I, for the reasons discussed infra, we do
not agree that such activities were incurred on JDP's behalf.  We
are not bound by conclusions or stipulations of law.  E.g.,
Estate of Sanford v. Commissioner, 308 U.S. 39, 51 (1939); Swift
& Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1917);
Saviano v. Commissioner, 765 F.2d 643, 645 (7th Cir. 1985) affg.
80 T.C. 955 (1983); Commissioner v. Ehrhart, 82 F.2d 338, 339
(5th Cir. 1936), revg. and remanding a Memorandum Opinion of the
Board of Tax Appeals; Yagoda v. Commissioner, 39 T.C. 170, 183
n.7 (1962), affd. 331 F.2d 485 (2d Cir. 1964).

293 U.S. 465 (1935). The objective economic realities of a transaction control the tax consequences of a given transaction rather than the particular form the parties employed. E.g., Frank Lyon Co. v. United States, supra at 572-573; Commissioner v. Court Holding Co., supra at 334; Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976). As the Court of Appeals for the Seventh Circuit has noted:

> The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. [Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).]

After reviewing the record in the instant cases, we agree in substance with respondent that JDP did not pay the $360,000 contract fee for research or experimentation to be conducted by HJI on JDP's behalf. Rather, for the reasons discussed below, we conclude that the moneys JDP remitted to HJI for the putative research or experimentation, in actuality, were paid for the limited partners' right to participate in the jojoba farming enterprise being operated by HJI in Hyder, Arizona. We are convinced that, from the inception of JDP, rather than being a stand-alone operation, Turtleback I functioned and was viewed as part of one integrated jojoba farming operation conducted by HJI.

In our view the R & D Agreement was designed and entered into solely to provide a mechanism to disguise the capital contributions of the limited partners as currently deductible expenditures and thus reduce the cost of their participation in the farming venture.

As the transaction was structured, JDP could obtain no economic benefit solely from the putative research or experimentation apart from the potential tax benefits.  No patents or inventions were expected to be developed.  In addition, any "discoveries" obtained through HJI's efforts were to be shared, without compensation, with other jojoba growers.  Consequently, JDP could receive no marketable asset from HJI's putative research or experimentation activities.  Plainly, no unrelated party would have paid HJI for a similar research and development contract under circumstances like those presented in this case.

Petitioners, nonetheless, contend that the R & D Agreement had independent value.  They assert that, as of December 31, 1981, the R & D Agreement had a fair market value of $382,000, and that the value of the anticipated benefits of the research was greater than the $360,000 JDP paid HJI under the R & D Agreement.  In addition, they contend that the value of the cost savings to the jojoba industry as a whole resulting from the nutrient studies exceeded the amount JDP paid HJI under the R & D Agreement.  Petitioners contend further that the parties to the

agreements believed that JDP would profit from the anticipated increased yield of jojoba seed resulting from the research and development project.  They also contend that JDP benefitted from the R & D Agreement by obtaining the right to use any "discoveries" resulting from the research or experimentation and by the joint venture TJV using those "discoveries" after the research and development period ended.  We disagree.

We believe that JDP received no economic benefit from its "right" to use "discoveries, technology, and other information" resulting from the putative research or experimentation.  The parties fully anticipated from the beginning that any such results were to be used by HJI and disbursed widely and freely throughout the jojoba industry.  We doubt that a disinterested third party under similar circumstances would have been willing to pay for the "right" to use any such "discoveries".

Furthermore, we do not agree with petitioners that the R & D Agreement had a fair market value of $382,000, as estimated by petitioners' expert.  The nutrient studies HJI conducted on Turtleback I by their very nature were applicable primarily, if not exclusively, to that site.  Gross, however, made no adjustment in his valuation of the R & D Agreement for its limited applicability.

In addition, Gross failed to take into consideration the value of the additional rights arising from other agreements the parties executed simultaneously with the R & D Agreement.  No one

denies that the only way anyone could possibly profit from the putative research or experimentation was from harvesting the seeds from the mature jojoba plants. Indeed, Drs. Glassley and Houser admitted in effect at the trial that they would never have participated in JDP had they thought that farming activities would not be conducted on Turtleback I. Yet, no valuation was made of the fair market value of any rights conveyed by the option and joint venture agreement or the option and farm lease agreement.

We believe that Gross did not value the other rights purportedly conveyed to JDP, in particular through the option and joint venture agreement, even after we suggested at the trial that he do so, because such valuations would have shown that the purported value of the R & D Agreement was overstated. In our view, in light of the manner in which the arrangement was structured, JDP could not have found a willing buyer for the R & D Agreement at any price, let alone the $360,000 it agreed to pay HJI, because JDP received no substantive ownership rights to the results of the putative research or experimentation.

Furthermore, we consider Gross' valuation of the purported benefits of HJI's putative research and development as highly exaggerated. The only way he was able to arrive at his $380,000 cost-savings estimate was arbitrarily to apply the alleged per acre savings to 1,000 acres. As the transaction was structured in 1981, however, JDP could only reap any profits from the 60

acres purportedly allocated to it. Others had interests in the large areas farmed by HJI in Hyder, so Gross' computation of the valuation for JDP was simply contrary to fact. Moreover, even Eberhardt states that the results of the nutrient studies were site specific. Therefore, petitioners' argument that the jojoba industry saved millions of dollars as a result of HJI's putative research or experimentation is outlandish.

In addition, we view with much skepticism testimony that the parties to these agreements anticipated that JDP would recoup the cost of the R & D contract fee from the increased production of the jojoba plants on Turtleback I resulting from a successful research program. The record reveals that no one made any projections before the agreements were executed, or afterward, relating to the profit potential of a 60-acre jojoba plantation. The profit projections in the offering were based on a jojoba plantation's containing a low of 160 acres and a high of 464 acres. The offering, furthermore, cautioned that JDP would face higher risks should only the projected minimum 160 acres be planted. Yet, nowhere is any attempt made to show that the results of operations on the 60 acres purportedly allocated to JDP could support the anticipated 5-year research and experimentation project to which the parties seemingly bound themselves in the R & D Agreement. Indeed, Gross admitted in his report that "It is not customary to conduct expensive research and experimentation on a pilot model, and then expect the pilot

operation to provide for recovery of such expense." Gross, furthermore, in effect acknowledged that the only effective use of any discoveries obtained would have been on a large-scale operation much greater than the 60 acres allocated to JDP. Even Whittaker testified that JDP, as a 60-acre partnership, was "not a self-sustaining unit". Petitioners, however, would have us believe that they expected not only to recover the full cost of the putative research or experimentation but also to earn a substantial profit from operations on the 60-acre plantation. In our view, given the structure of the putative research and development program, such an expectation would be pure fantasy. The self-serving nature of the claims, together with the absence of any evidence to support them, makes such testimony implausible.

Based on this record, we are convinced that the R & D Agreement was without economic substance. In our view, the R & D Agreement was mere window dressing, devised to attract investors for HJI's jojoba farming operation through the promise of a large upfront deduction for what in actuality were capital contributions. We note that the parties paid scant attention to the terms of the offering or the R & D Agreement. For example, the offering unequivocally states that, unless a minimum of 22 limited partnership units were sold by December 21, 1981, the offering would be terminated and any subscription payments would be returned. Only six limited partners had subscribed by

December 21, 1981, yet the offering was not terminated. Just four more limited partnership units were sold between December 22 and December 28, 1981 (two full units and two one-half units), for a total of nine full limited partnership units. Nonetheless, Berberich proceeded to close the offering and to execute the limited partnership agreement on December 31, 1981. The parties' haste to close the offering and form the limited partnership by yearend in contradiction to the express terms of the offering circular leads us to conclude that the primary objective of the transaction was to generate tax losses during the first year of the partnership and thus reduce the cost of petitioners' capital investment in a jojoba farming venture.

As for the R & D Agreement, Whittaker admitted at the trial that there was no way HJI could undertake the research or experimentation outlined in that agreement for $360,000. It is quite clear from the record, moreover, that as of December 31, 1981, no specific research and development plan had been formulated for the jojoba expected to be planted on Turtleback I. In fact, the research or experimentation plan devised for Turtleback I was not designed until 1983. Moreover, no cost estimates were made for the putative research or experimentation at the time the documents were executed, nor did an accounting system exist to allocate costs to JDP for at least the first 2 years of the purported research and development period. We conclude that the $360,000 contract fee was driven by the need to

provide the promised tax benefits for JDP's investors and that it was not based on the value of any anticipated services to be rendered by HJI.  Under such circumstances, we agree with respondent that the R & D Agreement did not delineate the agreement of the parties as to any research and development to be conducted, and it had no substance.

Petitioners contend, however, that the option and farm lease agreement, which purportedly accorded JDP the right to operate Turtleback I had HJI elected not to enter into a joint venture, shows that JDP was independent from HJI and intended to use the expected discoveries in a trade or business.  We do not agree.

First, as we have stated earlier, we believe that from its inception Turtleback I was not an independent jojoba plantation but functioned as a part of HJI's jojoba farming enterprise. Second, we are not convinced from this record that JDP ever had a realistic prospect of carrying on a jojoba farming operation. For example, JDP had no experience in farming jojoba.  As far as we can tell from the record, Berberich was not involved directly in the farming of jojoba on Turtleback I or anywhere.  He was a lawyer, not a farmer, and all of his activities concerned administering JDP or monitoring his own investments in the Hyder Jojoba plantations.  JDP, moreover, had no employees and no equipment, and it did not own the jojoba plants.  The record is devoid of any evidence that JDP could have operated a successful

jojoba plantation on 60 acres, or that if it could, that JDP would have had sufficient funds[20] to continue such operations. Nor is there any evidence that any limited partner could or would have stepped in to farm Turtleback I.

Although the parties took great care to clothe the transaction in the garments of research or experimentation, when we view the transaction closely, we are convinced that the limited partners were not paying for research or experimentation but for the right to share in the profits from HJI's jojoba farming enterprise. Under such circumstances, we conclude that the disputed payments were in the nature of capital contributions. Section 174 does not permit a deduction for a contribution to capital. See Safstrom v. Commissioner, T.C.

---

[20] The record does not reveal JDP's financial status as of Jan. 1, 1987, the purported commencement date of the Turtleback Jojoba Venture. However, we note that the limited partners were not obligated to contribute any funds to JDP beyond their initial partnership unit costs. Eight full and two one-half units in JDP were sold, resulting in total capital contributions from the limited partners of $450,000. According to the offering, the general partner was to contribute $1,000 to JDP. Therefore, at the most, JDP would have contributed capital of $451,000. JDP's partnership return for 1981 reflected the R & D Agreement contract fee of $360,000, syndication costs of $28,714, organizational costs of $12,125, and legal and accounting fees of $8,250, which totaled $408,289. As the transaction was structured, JDP could earn no income from its inception on Dec. 31, 1981, through Dec. 31, 1986. Accordingly, JDP's operating expenses for that period of time had to be paid from the remaining $41,711 contributed capital (unless advanced by the general partner). According to the offering, the general partner was to be paid $10,000 for each of 1981 through 1987. It appears unlikely, therefore, that as of Dec. 31, 1986, JDP would have had the financial resources to take over operations on Turtleback I if HJI had decided not to continue operations on that plot.

Memo. 1992-587, affd. without published opinion 42 F.3d 1401 (9th Cir. 1994); Reinke v. Commissioner, T.C. Memo. 1981-120.

In view of our conclusion that JDP did not pay HJI for research or experimentation, we need not further address petitioners' argument that during the alleged research and development period Turtleback I was functioning solely as a pilot or model, and therefore, the costs of its construction are deductible under section 1.174-2(a)(1), Income Tax Regs. We note, however, that as the foregoing discussion suggests, Turtleback I was not a model at all, and that, even if it had been a model, it would not have been a model for operation by or on behalf of JDP or its investors.

2. The Expenditures Must Be Paid or Incurred on Behalf of the Taxpayer

In the instant cases, respondent has conceded that some of HJI's activities on Turtleback I were research or experimentation in the experimental or laboratory sense. Petitioners contend that respondent's concession is dispositive of the question of the deductibility of the expenditures associated with the development of Turtleback I. We do not agree. See supra note 19. Such expenditures also must have been incurred on JDP's behalf.

Section 1.174-2(a)(2), Income Tax Regs., states that the provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation

undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization".  On this record, we are not persuaded that any research or experimentation performed on Turtleback I was conducted on JDP's behalf.  Rather, we are convinced that HJI operated an integrated jojoba farming operation in Hyder, Arizona, and that any research or experimentation conducted on Turtleback I was designed and implemented to aid HJI's entire jojoba enterprise.

As discussed above, there is no evidence that Turtleback I functioned independently of HJI.  Moreover, it is clear that from its inception JDP was viewed as a part of HJI's jojoba farming enterprise.  Indeed, the interrelationship of HJI and JDP can be seen in the following responses Whittaker made to questions posed to her on direct examination (by which petitioners were trying to establish that it was anticipated that the purported research and development program would lead to valuable discoveries (emphasis added)):

> Q. [Counsel]  What would be the nature of the property interest, the intangible property interest that the discoveries might constitute?

> A. [Whittaker] I am sorry.  By the end of the program or through the program, I think the nature of the property would be technological expertise, information or knowledge.  The question of patentability and licensing I think is a twofold issue. One is, is it proprietary or specific enough to be of the nature of being patentable, but really, more importantly or specific to our purposes, I did not, we did not consider that it was to the benefit of our

associated group to compartmentalize our information between one partnership and another, but rather it was to the benefit of all the parties, Jojoba Development parties, Hyder Jojoba, Inc., Hyder Jojoba Partners, which were the entities then in existence, to apply whatever knowledge we discovered to the benefit of all of the parties and move forward as a leading and profitable jojoba production company.

Q: So specifically with respect to JDP, did you expect the discoveries would be beneficial to JDP?

A: Absolutely.

Q: And how would it be beneficial specifically to JDP?

A: How would improving the - - it would be beneficial - -

Q: In other words, how would the discoveries be beneficial to JDP?

A: Assuming that we had discovered that a specific amount or regime of nutrient application could increase yield by a certain amount, that would not only benefit JDP specifically with regard to its operation under a joint venture, but would also benefit JDP, which is a 60-acre partnership and not a self-sustaining unit, but rather a group related to Hyder Jojoba, Inc. and all of its farm production, by contribution towards the development of an economically viable unit company/corporation that could produce jojoba effectively and profitably.

The record shows that HJI did not serve solely as JDP's agent. JDP had no power to direct or control any aspect of the research or experimentation process. Berberich's activities were solely ministerial. There is no evidence that JDP, Berberich, or any limited partner, was involved in, directed, or controlled any phase of the alleged research or experimentation project. Cf. Everett v. Commissioner, T.C. Memo. 1990-65, (citing Diamond v.

Commissioner, 92 T.C. 423, 443 (1989), affd. 930 F.2d 372 (4th Cir. 1991)).

At the time the R & D Agreement was executed, the costs of any research or experimentation to be conducted on Turtleback I had not been estimated. Under that agreement, HJI was to be responsible for all of the costs of operating Turtleback I. HJI would make all of the decisions relating to its operations and the putative research or experimentation, including deciding exactly what research or experimentation, if any, would be done. Although JDP purportedly paid a fixed contract fee for the putative research projects delineated in the R & D Agreement, at the time that agreement was executed neither party to the agreement expected HJI to carry out the described projects.

HJI, moreover, did not plan to make a profit from the receipt of the R & D contract fee. The fee was to provide HJI with working capital and financial resources to develop the jojoba plantation and conduct any research and development projects. Its profit would come only from operating the jojoba plantation.

HJI, furthermore, expected to, and did, use the results of its putative research or experimentation activities on all of the Hyder Jojoba plantations. HJI shared in the potential risks of failure and rewards of successful research or experimentation.

Under such circumstances, we conclude that JDP did not pay HJI $360,000 in consideration for obtaining ownership of the

discoveries resulting from the putative research or experimentation. Rather, we conclude that any research or experimentation that HJI conducted on Turtleback I was for its own benefit and on its own behalf.

### 3. The Expenditures Must Be Paid or Incurred in Connection with the Taxpayer's Trade or Business

Petitioners contend that the putative research or experimentation expenditures were paid or incurred in connection with JDP's trade or business. According to petitioners, the research was done in contemplation that JDP and HJI would form a joint venture with the express purpose of commercially and profitably farming jojoba upon the expiration of the research program if it was determined at that time that such venture would be commercially feasible. Furthermore, petitioners assert, the joint venture subsequently was formed, and it operated a commercial jojoba plantation on which the discoveries from the research or experimentation were used.

Respondent contends, on the other hand, that JDP was only a passive investor that never engaged in or planned to engage in its own separate trade or business. Respondent asserts that the passive nature of the investment is reflected in JDP's willingness to enter into the R & D Agreement without retaining any proprietary rights to any technology developed and where any discoveries obtained from the field testing would be available to anyone in the jojoba industry. Respondent contends that JDP's

actions following the execution of the R & D Agreement with HJI were ministerial at most and that HJI enjoyed complete discretion and control over any research or experimentation as well as the farming activities that were pursued after January 1, 1987.

Respondent contends further that the second phase of JDP, following the expiration of the R & D period, was highly speculative since it was conditioned on HJI's exercising an option to exploit the jojoba plantation that had been developed. If HJI refused to exercise the option, however, JDP could only realize profit from the arrangement by exercising its option to lease the property from Whittaker Jojoba, in which JDP's general partner held an interest. Respondent argues that these highly speculative and conditional arrangements could not rise to the status of a business, realized or anticipated, on December 31, 1981, when the research and development fee was deducted. Respondent asserts that JDP was only a vehicle "for the injecting of risk capital". Green v. Commissioner, 83 T.C. 667, 687 (1984); see also Levin v. Commissioner, 87 T.C. 698, 725 (1986), affd. 832 F.2d 403 (7th Cir. 1987).

In Snow v. Commissioner, 416 U.S. 500 (1974), the Supreme Court established that deductions under section 174 could be claimed in connection with a trade or business even though the taxpayer was not currently producing or selling any product. In following the Snow case, however, this Court has held that to be entitled to a deduction the taxpayer must be engaged in a trade

or business at some time and the activities must be sufficiently substantial and regular to constitute a trade or business. Green v. Commissioner, supra at 687-689. Where a partnership is claiming deductions under section 174, the controlling inquiry is whether there is a realistic prospect that the technology to be developed will be exploited in a trade or business of the entity in question. See Diamond v. Commissioner, 92 T.C. at 443; see also Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), affg. on this issue T.C. Memo. 1990-380; Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Harris v. Commissioner, T.C. Memo. 1990-80, supplemented by 99 T.C. 121 (1992), affd. 16 F.3d 75 (5th Cir. 1994). Mere legal entitlement to enter into a trade or business does not satisfy this test. Instead, "The legal entitlement must be backed by a probability of the firm's going into business." Levin v. Commissioner, 832 F.2d at 407; Kantor v. Commissioner, supra at 1520; LDL Research & Dev. II, Ltd. v. Commissioner, T.C. Memo. 1995-172; Stankevich v. Commissioner, T.C. Memo. 1992-458. But cf. Scoggins v. Commissioner, 46 F.3d 950 (9th Cir. 1995) revg. T.C. Memo. 1991-263, (where the Court of Appeals for the Ninth Circuit concluded that there was a realistic prospect that the partnership involved in that case would be engaged in a trade or business). In Scoggins, the individual taxpayers had directed the research themselves, had experience in marketing, and had the ability to provide the partnership with sufficient capital to manufacture

and market the equipment in question if the corporation did not do so.  The circumstances in Scoggins are wholly different from those presented here.  See LDL Research & Dev. II, Ltd. v. Commissioner, supra, also distinguishing the Scoggins case.

A facts and circumstances test has been employed by this Court in determining whether there is a realistic prospect that a partnership may enter into a trade or business with respect to technology that is to be developed.  We have considered such factors as the terms of the parties' contractual arrangements, the intentions of the parties involved in the arrangement, the amount of capitalization retained by the partnership during the research and development contract period, the exercise of control by the partnership over the person or organization doing the research, the business activities of the partnership, the capacity and incentive, if any, of the partnership to use the products in its own trade or business, and the experience of the partners.  E.g., Diamond v. Commissioner, supra at 438-440; Levin v. Commissioner, 87 T.C. at 726-728; Mach-Tech, Ltd. Partnership v. Commissioner, T.C. Memo. 1994-225, affd. 59 F.3d 1241 (5th Cir. 1995); Stankevich v. Commissioner, supra; Double Bar Chain Co. v. Commissioner, T.C. Memo. 1991-572.

The grant of an exclusive license to exploit technology prior to commencement of research and development may preclude a licensor from engaging in a trade or business with respect to the technology.  See Levin v. Commissioner, 87 T.C. at 726-727; Green

v. Commissioner, supra.  In addition, this Court has also
disallowed deductions claimed for research and experimental
expenditures even though the licenses had not officially been
entered into upon execution of the research and development
agreements.  See Stauber v. Commissioner, T.C. Memo. 1992-128;
Double Bar Chain Co. v. Commissioner, supra.  In Stauber, we
found that the partnership never intended to enter into a trade
or business with respect to the technology, and that there was a
pre-existing understanding regarding a future license of the
technology.  In Double Bar Chain Co. v. Commissioner, supra, we
held that even though there was no written license agreement, the
partnership never intended to enter the trade or business of
manufacturing and marketing the technology.  The relevant factors
in this determination included the limited capital retained in
the partnership, the private offering memorandum stating that
none of the essential activities relating to the technology would
be conducted by the partnership, the lack of control over the
research activities, and the lack of experience of the investors.

In Stankevich v. Commissioner, supra, we looked to the
passive nature and limited activity of the partnerships, as well
as their lack of control over all aspects of the investment, in
holding that the general partner never intended that the
partnerships would enter into a trade or business.  We also held
that the contractual arrangements between the parties made the
prospects unrealistic that the partnerships would ever be capable

of entering into a trade or business with respect to any technology that might be developed. Consequently, we held that "Everything that * * * [the taxpayers] did was wholly consistent with investor activity, not the activity of a person engaged in an active trade or business." Id.

In determining whether research and development expenditures were incurred in the taxpayer's trade or business, this Court has considered a two-step inquiry: (1) Whether the taxpayer's activities in connection with the venture were sufficiently substantial and regular to constitute a trade or business and (2) whether the taxpayer had the requisite profit objective in undertaking the activity. See Green v. Commissioner, 83 T.C. 667, 687 (1984); Stankevich v. Commissioner, supra. Petitioners contend that such requirements have been satisfied in the present cases because TJV's primary motive in farming jojoba was to realize profit, and its farming operations were continual and regular.

Petitioners contend that the present cases are distinguishable from cases such as Green v. Commissioner, supra, Levin v. Commissioner, supra, and Stankevich v. Commissioner, supra, because JDP actually formed a joint venture with HJI in 1987 that commercially farmed jojoba. Petitioners argue that the formation and operation of that joint venture is determinative of the trade or business question. We do not agree. The fact that some enterprise, be it HJI or TJV, was conducting commercial

farming on Turtleback I is not determinative.  As we have stated
previously, "the mere presence of a valid business enterprise at
some levels of a transaction does not automatically entitle
passive investors distant from day-to-day operations of the
enterprise to the associated tax benefits."  Beck v.
Commissioner, 85 T.C. 557, 580 (1985).  Rather, to resolve the
trade or business question in the instant cases we must focus on
JDP, not TJV, as petitioners would have us do.  For the reasons
set forth above, we conclude that JDP did not intend to engage,
nor did it engage, in its own trade or business.

As stated previously, we have concluded that Turtleback I
was not operated as an independent jojoba plantation.[21]  JDP
functioned from the beginning as a part of HJI's farming
enterprise.  JDP's relationship with HJI did not change as of
January 1, 1987, when purportedly the research and development
period ended and the putative joint venture operation commenced.
HJI continued to have sole responsibility and control over the
jojoba farming operations.  JDP moreover was not called upon to
provide any additional contributions to fund the operations of
the joint venture.  The fact that JDP would begin to share in any
profits after formation of the joint venture is not determinative
since no profits could have been expected during the putative

---

[21]    We may take into account a taxpayer's actions in years
subsequent to the years in issue in evaluating the taxpayer's
prospects during the years in issue.  Levin v. Commissioner, 832
F.2d, 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698 (1986).

research and development period because that period coincided with the maturation period of the jojoba plants. The only ostensible difference in the relationship between JDP and HJI is that allegedly after 1986, as general partners, both JDP and HJI would be jointly liable for any debts and losses of a joint venture. In the present cases, however, we find that difference to be without distinction. We are guided by the maxim that "the relevant inquiry is the actual manner, not the form, in which the parties intended to structure their relationship." Slappey Drive Indus. Park v. United States, 561 F.2d 572, 583 (5th Cir. 1977), affg. Cairo Developers, Inc. v. United States, 381 F. Supp. 431 (M.D. Ga. 1974); see also Saviano v. Commissioner, 765 F.2d 643, 650 (7th Cir. 1985), affg. 80 T.C. 955 (1983). JDP was a limited partnership. Consequently, the potential liability of the individual partners did not change as a result of the formation of Turtleback Jojoba Venture.

The mere presence of a profit motive, moreover, is not determinative of whether the section 174 deduction will be allowed. What is significant in the instant cases is that JDP never actually managed or controlled the use or marketing of the results of the research or experimentation. See Harris v. Commissioner, 16 F.3d 75 (5th Cir. 1994), affg. T.C. Memo. 1990-80.

JDP did not have a realistic prospect of carrying on its own jojoba farming business. Even though JDP had an option to farm

Turtleback I at the end of the R & D period, it would have the opportunity to exercise that option only if HJI decided that it would be uneconomical to enter into the Turtleback Jojoba Venture with JDP. As we stated previously, there is no evidence that JDP would have had the technical expertise or financial resources to operate a jojoba plantation had HJI not exercised its option to enter into Turtleback Jojoba Venture. There is no evidence that Berberich or any limited partner could or would have stepped in to operate a commercial jojoba plantation on Turtleback I commencing in 1987. Neither JDP nor any of its partners had any experience in farming jojoba. JDP, moreover, had no employees, equipment, or any other physical assets, and apparently would not have had sufficient funds to acquire the necessary assets to operate a jojoba plantation after the 5 to 6 years needed for the jojoba plants to become productive. JDP, moreover, was allocated only 60 acres on which to operate such plantation, which, from the evidence in this case, was insufficient acreage on which to conduct such an operation.

Under such circumstances, we conclude that at the time the R & D Agreement was executed, JDP did not intend to engage in a business of its own. Because of this conclusion, we do not address alternative arguments raised by the parties in support of their various positions.

Accordingly, we hold that petitioners are not entitled to deduct losses attributable to JDP's deduction for research or

experimentation expenditures under section 174.  Respondent is sustained on this issue.

B.  Negligence

Respondent determined that petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2).  Section 6653(a)(1) provides for an addition to tax in an amount equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations.  Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest payable under section 6601 with respect to that portion of an underpayment attributable to negligence or intentional disregard of rules and regulations.

Negligence is defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances.  E.g., Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Sandvall v. Commissioner, 898 F.2d 455, 458 (5th Cir. 1990), affg. T.C. Memo. 1989-189 and T.C. Memo. 1989-56; Forseth v. Commissioner, 845 F.2d 746, 749 (7th Cir. 1988), affg. 85 T.C. 127 (1985); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The question is whether a particular taxpayer's actions in connection with the transaction were reasonable in light of his experience and the nature of the investment or business.  See Henry Schwartz Corp. v.

Commissioner, 60 T.C. 728, 740 (1973).  A taxpayer may not be negligent but still violate section 6653(a)(1) and (2) by intentionally disregarding respondent's rules and regulations. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299.  Petitioners have the burden of proving that the underpayment of tax was not due to their negligence or intentional disregard of rules and regulations.  Rule 142; Sandvall v. Commissioner, supra at 459; Forseth v. Commissioner, supra; Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

### 1.  Petitioners Glassley and Houser

Petitioners Glassley and Houser contend that the addition to tax for negligence under section 6653(a)(1) and (2) is not applicable to them because they relied in good faith on the advice of competent professionals that the tax treatment for the putative research and development expenditures was proper. Respondent asserts, on the other hand, that petitioners have not demonstrated that they were reasonable in relying upon their accountants.  She contends further that petitioners have not shown what advice, if any, they received from their accountants or that the accountants had sufficient knowledge of the facts to render a competent opinion.  We agree with respondent.

Reliance on the advice of competent professionals, even if erroneous, may form the basis for a successful defense against the imposition of an addition to tax for negligence.  E.g., Weis

v. Commissioner, 94 T.C. 473, 487 (1990); Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. 398 F.2d. 832 (6th Cir. 1968). However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but only one factor to be considered. Freytag v. Commissioner, supra; Reimann v. Commissioner, T.C. Memo. 1996-84; Kaplan v. Commissioner, T.C. Memo. 1994-81. A taxpayer's reliance must be reasonable, in good faith, and based on full disclosure. Ewing v. Commissioner, supra; Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). Further, reliance on a tax professional will not absolve taxpayers where they are aware that the "facts" upon which they predicate their deductions are not the facts of the transaction in issue. McCrary v. Commissioner, 92 T.C. 827, 847 (1989).

Dr. Glassley testified that he relied on his accountant in claiming the disputed expenditures while Dr. Houser testified that he relied on his accountant and his brother, an attorney. To show good faith reliance, petitioners Glassley and Houser must establish that these individuals were competent to render the advice, that petitioners supplied them with all necessary information, and that the incorrect return was a result of the

professional's mistakes.  Weis v. Commissioner, supra; Conlorez Corp. v. Commissioner, 51 T.C. 467, 474 (1968).

Neither petitioners Glassley nor Houser have established that their accountants (or brother) had specialized knowledge of the jojoba industry or of agricultural research.  Nor have petitioners Glassley or Houser established the extent or nature of these individuals' tax expertise.  None of these alleged professionals, moreover, made an independent investigation of the JDP partnership or hired anyone to make such an investigation. In evaluating the transaction, petitioners Glassley's accountant and petitioners Houser's accountant and Dr. Houser's brother relied solely on the offering circular.  See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from persons with an interest in the transaction "is better classified as sales promotion".

Furthermore, there is no reliable evidence in the record suggesting the exact nature of the advice, if any, that was given.  Neither of the accountants nor Dr. Houser's brother testified.  We cannot assume that their testimony would have been favorable to petitioners.  The normal inference is that it would have been unfavorable.  Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Bresler v. Commissioner, 65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v.

Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

On this record, we conclude that petitioners Glassley and Houser did not act in good faith reliance on professional advice. In each case, the record shows that they acted on their fascination with the idea of participating in a jojoba farming venture and their satisfaction with tax benefits of expensing their investments, which were clear to them from the promoter's presentation. They passed the offering circular by their accountants for a "glance", and Dr. Houser spoke with his brother, an attorney, though apparently not a person knowledgeable about tax matters or agriculture. The facts here do not establish consultation with an expert. Cf. Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part, revg. in part T.C. Memo. 1994-179. Petitioners Glassley and Houser have not established that their purported reliance on the advice of their accountants (and brother) actually occurred or was reasonable, in good faith, and based on full disclosure. Hence, such alleged reliance is not sufficient to shield them from liability for the negligence additions to tax.

An addition to tax for negligence is correctly assessed in cases where deductions claimed on returns are not supported by the facts. Sandvall v. Commissioner, supra; Marcello v. Commissioner, supra. Petitioners claimed deductions for purported research and experimental expenditures that we have found to have

been in actuality contributions to capital.  Based on the record, we conclude that petitioners Glassley and Houser knew, or should have known, that JDP's payments to HJI were not made for the purposes stated in the R & D Agreement.  We conclude further that they nonetheless deliberately disregarded respondent's rules and regulations in claiming as research or experimentation expenditures on their tax returns for the years in issue the bulk of their capital contributions for the right to participate in HJI's jojoba farming enterprise.

Accordingly, we hold that petitioners Glassley and Houser are liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2).  Respondent is sustained on this issue.

### 2.  Dr. Mahoney

Dr. Mahoney did not testify at trial and he has presented no evidence on this issue.  Consequently, Dr. Mahoney has failed to carry his burden of showing that, in claiming the disputed deductions, he was not negligent or did not intentionally disregard respondent's rules and regulations.  Accordingly, he also is liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2).  Respondent is sustained on this issue.

## C.  Increased Interest

Respondent determined in the notices of deficiency that the increased interest under section 6621(c) applied to petitioners

Glassley and petitioner Mahoney.  Respondent also asserted by amended answer that the increased interest under section 6621(c) applied to petitioners Houser.  Respondent has the burden of proof with respect to the increased interest asserted in the amendment to answer.  Rule 142(a); Zirker v. Commissioner, 87 T.C. 970, 981 (1986).

The increased rate of interest under section 6621(c) is 120 percent of the statutory rate imposed on underpayments under section 6601 if the underpayment exceeds $1,000 and is attributable to a tax-motivated transaction (as defined in section 6621(c)(3)).  The increased interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into before that date.  Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986).

Respondent contends that the increased rate of interest under section 6621(c) applies because the research and development expense deductions that petitioners claimed resulted in a "substantial underpayment" attributable to a tax-motivated transaction.

Section 6621(c)(3)(A) enumerates types of transactions that are considered "tax-motivated transactions".  Furthermore, section 6621(c)(3)(B) gives the Secretary of the Treasury authority, by regulation, to add to the categories of

transactions that will be treated as tax-motivated transactions. The definition of a tax-motivated transaction includes "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period."  Sec. 6621(c)(3)(A)(iv). In Bailey v. Commissioner, 90 T.C. 558, 628 (1988), affd. in part and remanded on another issue 912 F.2d 44 (2d Cir. 1990), the Court determined that the deduction from income of management fees that should have been capitalized and amortized was a distortion of income under section 6621(c)(3)(A)(iv); see also Lieber v. Commissioner, T.C. Memo. 1993-391; Upham v. Commissioner, T.C. Memo. 1989-253, affd. 923 F.2d 1328 (8th Cir. 1991); sec. 301.6621-2T, Temporary Admin. & Proced. Regs., 49 Fed. Reg. 50391, 50392 (Dec. 28, 1984), 1985-1 C.B. 368.[22]

---

[22]     Sec. 301.6621-2T, Temporary Proced. & Admin. Regs., in pertinent part provides as follows in question and answer format:

>     Q-3:  What accounting method may result in a substantial distortion of income for any period under [sec. 6621(c)(3)(A)(iv)]?
>     A-3:  A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment:

>          *     *     *     *     *     *     *

>     (9)  In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction

(continued...)

JDP (and thus petitioners) claimed deductions for research and development expenditures that we found were in actuality nondeductible contributions to capital.  Such deductions caused a material distortion of their income.  See Lieber v. Commissioner, supra; Upham v. Commissioner, supra.  The underpayment resulting from such disallowed deductions is therefore attributable to a tax-motivated transaction.  Accordingly, petitioners are liable for the additional interest determined in the notices of deficiency or asserted by amendment to answer.  Respondent is sustained on this issue.

To reflect the foregoing,

Decisions will be entered for respondent in docket Nos. 13431-89 and 24177-89.

Decision will be entered under Rule 155 in docket No. 19140-89.

---

[22](...continued)
disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income (see, e.g., Rev. Rul. 79-229, 1979-2 C.B. 210).